# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Filed February 1, 2008

**No. 06-1197**

Haji Bismullah *a/k/a* Haji Bismillah, and *a/k/a* Haji Besmella,
Haji Mohammad Wali, Next Friend of Haji Bismullah,
Petitioners

v.

Robert M. Gates, Secretary of Defense,
Respondent

**No. 06-1397**

Huzaifa Parhat, et al.,
Petitioners

v.

Robert M. Gates, Secretary of Defense, et al.,
Respondents

## No. 07-1508

Abdusabour,
Petitioner

v.

Robert M. Gates, U.S. Secretary of Defense, et al.,
Respondents

————

## No. 07-1509

Abdusemet,
Petitioner

v.

Robert M. Gates, U.S. Secretary of Defense, et al.,
Respondents

————

## No. 07-1510

Jalal Jalaldin,
Petitioner

v.

Robert M. Gates, U.S. Secretary of Defense, et al.,
Respondents

————

3

**No. 07-1511**

Khalid Ali,
Petitioner

v.

Robert M. Gates, U.S. Secretary of Defense, et al.,
Respondents

————

**No. 07-1512**

Sabir Osman,
Petitioner

v.

Robert M. Gates, U.S. Secretary of Defense*, et al.,
Respondents

————

**No. 07-1523**

Hammad,
Petitioner

v.

Robert M. Gates, Secretary of Defense and Wade F. Davis,
Colonel, USA,
Respondents

————

4

On Petition for Rehearing En Banc and Motions
_____

**BEFORE**:   GINSBURG, *Chief Judge*, and SENTELLE,
             HENDERSON, RANDOLPH, ROGERS, TATEL,
             GARLAND, BROWN, GRIFFITH, and
             KAVANAUGH, *Circuit Judges*

## O R D E R

Respondents' petition for rehearing en banc and the response thereto were circulated to the full court, and a vote was requested.  Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition.  Upon consideration of the foregoing and the motion to expedite review of the petition for rehearing en banc and any subsequent proceedings; the motion for leave to file ex parte/in camera top secret-SCI declarations for judges' review only and the joint opposition thereto; and the letters filed pursuant to Federal Rule of Appellate Procedure 28(j), it is

**ORDERED** that the petition for rehearing en banc be denied.  It is

**FURTHER ORDERED** that the motion to expedite be dismissed as moot.  It is

**FURTHER ORDERED** that the motion for leave to file ex parte/in camera top secret-SCI declarations for judges' review only be granted.

5

**Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

Deputy Clerk

*Circuit Judges* SENTELLE, HENDERSON, RANDOLPH, BROWN, and KAVANAUGH would grant the petition for rehearing en banc.

A separate statement concurring in the denial of rehearing en banc filed by *Chief Judge* GINSBURG, with whom *Circuit Judges* ROGERS, TATEL, and GRIFFITH join, is attached.

A separate statement concurring in the denial of rehearing en banc filed by *Circuit Judge* GARLAND is attached.

A separate statement dissenting from the denial of rehearing en banc filed by *Circuit Judge* HENDERSON, with whom *Circuit Judges* SENTELLE, RANDOLPH, and KAVANAUGH join, is attached.

A separate statement dissenting from the denial of rehearing en banc filed by *Circuit Judge* RANDOLPH, with whom *Circuit Judges* SENTELLE, HENDERSON, and KAVANAUGH join, is attached.

A separate statement dissenting from the denial of rehearing en banc filed by *Circuit Judge* BROWN is attached.

GINSBURG, *Chief Judge*, with whom *Circuit Judges* ROGERS, TATEL, and GRIFFITH join, concurring in the denial of rehearing en banc: The panel that heard this case held that "the record on review must include all the Government Information," which the controlling DoD Regulations define as "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant." *Bismullah v. Gates (Bismullah II)*, 503 F.3d 137, 138-39 (2007); *Bismullah v. Gates (Bismullah I)*, 501 F.3d 178, 185-86 (2007); E-1 § E(3). In his dissent from the court's denial of rehearing *en banc*, Judge Randolph says of the panel's ruling that it "is contrary to the rule and the statute governing the contents of the record in cases such as these, it violates the restrictions on our jurisdiction in the Detainee Treatment Act [(DTA), Pub. L. No. 109-148, § 1005(e)(2), 119 Stat. 2680, 2742-43 (Dec. 30, 2005) (codified as amended at 10 U.S.C. § 801 note)], and it risks serious security breaches for no good reason." Stmt. of Randolph, J., at 1. Like Judge Randolph, I would not ordinarily write a separate opinion on a denial of rehearing *en banc*, but his suggestion that the panel's decision was not only erroneous but also dangerous should not go unremarked.

Judge Randolph contends that 28 U.S.C. § 2112(b) and Federal Rule of Appellate Procedure 16(a), which implements § 2112(b), "make crystal clear that ... the record does not include information never presented to the Combatant Status Review Tribunal" (CSRT).[1] Stmt. of Randolph, J., at 1-2. Section

---

[1] Judge Randolph also implies the panel ignored the provisions of the DoD Regulations that define the "Record of Proceedings" before the CSRT, namely, E-2 § C(8) & (10). In fact, the panel not only epitomized both E-2 § C(8) and E-2 § C(10), *see Bismullah I*, 501 F.3d at 182; *see also Bismullah II*, 503 F.3d at 139 (citing E-2 § C(8)), it expressly rejected the Government's contention that the

2112(b) states: "The record to be filed in the court of appeals ... shall consist of the order sought to be reviewed or enforced, the findings or report upon which it is based, and the pleadings, evidence, and proceedings before the agency, board, commission, or officer concerned." *Accord* FED. R. APP. P. 16(a). The term "agency," in turn, "includes any department, independent establishment, commission, administration, authority, board or bureau of the United States ... unless the context shows that such term was intended to be used in a more limited sense." 28 U.S.C. § 451. Judge Randolph asserts that § 2112(b) applies to our review pursuant to the DTA of a CSRT's status determination because a CSRT is within a military department and a "military department is a 'department' under § 451, and thus an 'agency' under § 2112(b)." Stmt. of Randolph, J., at 3.

Section 2112(b) does not define the record on review of a CSRT proceeding because a military department is not an agency under 28 U.S.C. § 451. Several provisions of Title 28 distinguish between an "agency" and a "military department," which necessarily implies that a military department is not an agency. *See* 28 U.S.C. § 530D(e) ("executive agencies and military departments"); 28 U.S.C. § 530C(b)(L)(iv) ("executive agency or military department"); 28 U.S.C. § 530D(d) ("executive agency or military department"); *cf.* 28 U.S.C. § 2671 (defining "[f]ederal agency" specifically to include "the military departments" for purposes of certain sections of Title 28

---

Record of Proceedings constitutes the record on review for reasons stated in the panel's two opinions. *See Bismullah I*, 501 F.3d at 184-86; *Bismullah II*, 503 F.3d at 139-41.

that have no bearing upon § 2112).[2]

Judge Randolph dismisses these provisions on the ground that in them the term "agency" is always modified by "executive" or "federal," which suggests a more limited conception of "agency" there than in § 451, where it appears without modification. Stmt. of Randolph, J., at 3. For confirmation, he points to § 2 of the Administrative Procedure Act, 5 U.S.C. § 551(1)(F), which excludes "courts martial and military commissions" from the definition of "agency" for purposes of that Act. Stmt. of Randolph, J., at 3 & n.3. Judge Randolph seems to believe that by defining "agency" broadly and then excluding courts martial and military commissions, the APA implies that courts martial and military commissions are agencies except where "expressly excluded"; because Title 28, unlike the APA, does not expressly exclude courts martial and military commissions from its scope, courts martial and military commissions are presumably agencies for purposes of that title, including §§ 451 and 2112.

This reasoning tells us nothing about a CSRT, however, unless a CSRT is a court martial or military commission, which it assuredly is not. *See* 10 U.S.C. § 802 (specifying persons subject to court martial); 10 U.S.C. § 817 (defining jurisdiction of court martial); 10 U.S.C. §§ 877-934 (enumerating substantive offenses that may be tried before a court martial); *see* 10 U.S.C. § 948b(f) (defining "military commission"); 10

---

[2] *See W. Va. Univ. Hosps. v. Casey*, 499 U.S. 83, 88-92, 100-01 (1991) (holding "attorney's fees" and "expert fees" distinct for purposes of 42 U.S.C. § 1988 because "[i]f ... the one includes the other, dozens of statutes referring to the two separately become an inexplicable exercise in redundancy").

U.S.C. § 948d(c) (distinguishing military commission from CSRT); *compare* DTA § 1005(e)(2) ("Review of decisions of combatant status review tribunals of propriety of detention") *with* DTA § 1005(e)(3) ("Review of final decisions of military commissions").[3] Not coming within any exclusion from the APA, therefore, a CSRT must be either an agency subject to the APA or, as I believe it is, something *sui generis* and outside the contemplation of the APA. If a CSRT were an agency subject to the APA, then the detainees at Guantánamo would presumably be entitled to the significant procedural rights afforded by the APA. The notion that a CSRT is subject to the APA is completely inconsistent with the Congress' understanding when, by enacting the DTA, it ratified the procedural framework for CSRTs established by the DoD Regulations. In summary, a CSRT can be structured as it is under the DoD Regulations only because it is not a court martial, not a military commission, and not an agency.[4]

---

[3] Judge Randolph says 5 U.S.C. § 551 also expressly excludes "other military authorities." Stmt. of Randolph, J., at 3 n.3. In fact, the exclusion is for "military authority exercised in the field in time of war or in occupied territory." 5 U.S.C. § 551(1)(G). Citing his own concurring opinion in *Al Odah v. United States*, 321 F.3d 1134, 1149 (2003), Judge Randolph argues a CSRT is a military authority exercised in the field in a time of war. Stmt. of Randolph, J., at 3 n.3. No court has ever so held and, in any event, no party to this case has suggested as much.

[4] Of course, if a CSRT were a court martial or a military commission, then the detainees would be entitled to greater procedural rights than they have under the DoD Regulations. *See* 10 U.S.C. §§ 830-876b (defining procedures for court martial); 10 U.S.C. §§ 948q-950j (defining procedures for military commission).

5

It would be particularly untoward to apply § 2112(b) outside its apparent field of application – and particularly improbable the Congress so intended – when the result would be to preclude the court from discharging the review function assigned to it in the DTA. That review function is broader than Judge Randolph suggests. The DTA charges the court with reviewing not only "whether ... the conclusion of the Tribunal [was] supported by a preponderance of the evidence," but also whether it was reached in a manner "consistent with the standards and procedures specified by the Secretary of Defense" for CSRTs. DTA § 1005(e)(2)(C).

The DoD Regulations, which establish the "standards and procedures" to be followed by the Recorder, the detainee's Personal Representative, and the CSRTs themselves, require the Recorder to obtain all the Government Information, E-1 § C(2); E-2 § C(1), to cull from the Government Information and forward to the Tribunal such information "as may be sufficient to support the detainee's classification as an enemy combatant" together with all exculpatory information, E-1 § H(4); E-2 §§ B(1), C(6), and to share all the Government Information with the detainee's Personal Representative, E-1 § F(8); E-2 § C(4). In order to review whether the Recorder performed these tasks, the court obviously must see all the Government Information.[5] *See*

_____

[5] The record before the court suggests the Recorder has not always fulfilled his obligations under the DoD Regulations. *See* Decl. of Stephen Abraham, Lieutenant Colonel, U.S. Army Reserve ¶¶ 5-19 (June 15, 2007) (stating "the information comprising the Government Information and the Government Evidence was not compiled personally by the CSRT Recorder;" "on a number of occasions" his request that an originating agency provide "a written statement that there was no exculpatory evidence ... [was] summarily denied;" the

*Bismullah I*, 501 F.3d at 185-86; *Bismullah II*, 503 F.3d at 139-40.  Further, the court will be able to assess whether any failure by the Recorder to perform these tasks affected the weight of the evidence before the CSRT only if the court can consider that failure in light of all the information the Recorder was supposed to collect and forward.  *See Bismullah I*, 501 F.3d at 185-86; *Bismullah II*, 503 F.3d at 139-40.  Irrespective, therefore, of what § 2112 might say in general about the scope of a record on review, the DTA requires that the record on review of a CSRT's status determination include all the Government Information, regardless whether it was all put before the Tribunal.

Judge Randolph lodges two pragmatic objections to this analysis.  First, he argues "it is impossible for us to determine whether any particular piece of information was obtained or was not obtained by any particular Recorder in any particular detainee's case" because "Recorders ... did not save the information they obtained unless" they forwarded it "to the Tribunal."  Stmt. of Randolph, J., at 5-6.  Judge Randolph is correct – which is why the panel held the Government could

---

people "preparing materials for use by the CSRT board members did not know whether they had examined all available information or even why they possessed some pieces of information but not others;" and "the case writer or Recorder, without proper experience or a basis for giving context to information, often rejected some information arbitrarily while accepting other information without any articulable rationale"); Decl. of James M. McGarrah, Rear Admiral (Ret.), U.S. Navy ¶¶ 4-6, 10-13 (May 31, 2007) (stating that after September 1, 2004 the Recorder did not "personally collect[] the Government Information" and that the Recorder withheld from the Tribunal exculpatory Government Information if in his view it was "duplicative" or "if it did not relate to a specific allegation being made against the detainee").

either "reassemble the Government Information it did collect or ... convene a new CSRT." *Bismullah II*, 503 F.3d at 141-42.[6]

Second, Judge Randolph argues that "at most ... the record on review should consist only of the evidence before the Tribunal plus any exculpatory information the government has discovered." Stmt. of Randolph, J., at 6. Of course, the Recorder is supposed to forward *all* the exculpatory Government Information to the Tribunal. *See* E-1 § H(4); E-2 §§ B(1), C(6). But the court is no more able than the CSRT itself to determine whether the Recorder withheld any exculpatory Government Information from the CSRT – unless, that is, subject to the national security limitations discussed below, counsel may see and draw the attention of the court to any arguably exculpatory Government Information the Recorder did not put before the Tribunal. *See* Decl. of Stephen Abraham, Lieutenant Colonel, U.S. Army Reserve ¶¶ 10-17 (June 15, 2007) ("asked to confirm and represent in a statement to be relied upon by the CSRT board members that the [originating intelligence] organizations did not possess 'exculpatory information' relating to [detainees who were] the subject of the CSRT, ... [I could not] reach [such] a conclusion ... without knowing that I had seen all information, [but I] was never told that the information that was provided [to me by the originating organizations] constituted all available information").

---

[6] The Government is reportedly now "review[ing] ... whether to conduct new hearings" out of concern that it may not have "take[n] everything into consideration when [it] did the original" CSRTs. William Glaberson, *New Detention Hearings May Be Considered*, N.Y. TIMES, Oct. 14, 2007 (quoting Capt. Theodore Fessel, Jr.), *available at* http://www.nytimes.com/2007/10/14/us/14cnd-gitmo.html.

One need not impute to the Recorder negligence much less bad faith to see that the DTA requires the court to review his adherence to the DoD Regulations. Because the DoD Regulations assign to the Recorder a central role in the CSRT process, to ignore the actions of the Recorder – and especially to ignore the evidence the Recorder did not put before the Tribunal – would render utterly meaningless judicial review intended to ensure that status determinations are made "consistent with" the DoD Regulations. DTA § 1005(e)(2)(C). Unlike the final decision rendered in a criminal or an agency proceeding, which is the product of an open and adversarial process before an independent decisionmaker, a CSRT's status determination is the product of a necessarily closed and accusatorial process in which the detainee seeking review will have had little or no access to the evidence the Recorder presented to the Tribunal, little ability to gather his own evidence, no right to confront the witnesses against him, and no lawyer to help him prepare his case, and in which the decisionmaker is employed and chosen by the detainee's accuser. *See* E-1 §§ A, B, C(1), C(3), E(2), E(4), F, G(2), G(8), G(9), H(7).[7] As a result, the Recorder's failure to adhere to the DoD Regulations can influence the outcome of the proceeding to a degree that a prosecutor or an agency staff member cannot; as a practical matter, the Recorder may control the outcome. For this court to ignore that reality would be to proceed as though the Congress envisioned judicial review as a mere

_____

[7] The detainee obviously cannot be given access to the classified portion of the Government Information. The detainee's Personal Representative, who is "neither a lawyer nor [the detainee's] advocate," E-3 § D, is not obligated to but "may share the unclassified portion of the Government Information with the detainee." E-1 §§ F(8), G(8), H(7).

charade when it enacted the DTA. Thus, the analogy Judge Henderson draws between our review of status determinations under the DTA and our review of agency decisions, Stmt. of Henderson, J., at 3-4, is inapt.

Judge Henderson's comparison of a status determination proceeding before a CSRT to a probable cause hearing for a criminal defendant is likewise wide of the mark. She asks, "If we can determine whether the preponderance of the evidence supports a probable cause finding sufficient to hold an arrestee for trial without knowing (much less, reviewing) all the evidence in the prosecutor's possession, can we not do so in reviewing the evidence supporting the 'enemy combatant' designation?" Stmt. of Henderson, J., at 2-3. The critical question, however, is not whether it is possible for the court to review the determination of a CSRT based solely upon the evidence that was before the CSRT, but whether that would be the presumably meaningful review the Congress prescribed. Note also that a panoply of constitutional and statutory protections ensures that a person imprisoned after a probable cause hearing will receive a speedy trial and be convicted or released, thereby mitigating the impact of an erroneous finding of probable cause predicated upon limited and possibly one-sided evidence. In contrast, the determination of a CSRT is only a determination of the detainee's status as an enemy combatant.[8] Thereafter, it may be

---

[8] The DoD Regulations define an enemy combatant as "an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners." E-1 § B; *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004): "The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again." The Government reportedly "hope[s] to try

that nothing prevents the Government from holding an enemy combatant "for the duration of the relevant conflict." *Hamdi v. Rumsfeld*, 542 U.S. 507, 518-21 (2004)[9]; *see Boumediene v. Bush*, 476 F.3d 981, 988-94 (D.C. Cir. 2007) (holding alien detained as enemy combatant at Guantánamo Bay has no constitutional right to writ of habeas corpus), *cert. granted*, 127 S. Ct. 3078 (June 29, 2007) (No. 06-1195).

Finally, Judge Randolph raises the concern that "sharing [the Government Information] with private counsel [will] give[] rise to a severe risk of a security breach." Stmt. of Randolph, J., at 6. The panel, however, accommodated, to the full extent requested by the Government, its position that certain types of

---

eventually as many as 80 of the 305 detainees at Guantánamo," William Glaberson, *Witness Names to Be Withheld From Detainee*, N.Y. TIMES, Dec. 1, 2007, *available at* http://www.nytimes.com/2007/12/01/us/nationalspecial3/01gitmo.html, which suggests that, if the Government intends to continue holding the remaining 225 detainees, it intends to do so solely upon the basis of their status determinations.

[9] The Supreme Court left open the question whether the Government may subject an enemy combatant to an "indefinite or perpetual detention." *Hamdi*, 542 U.S. at 521 ("[W]e understand Congress' grant of authority for use of 'necessary and appropriate force' to include the authority to detain for the duration of the relevant conflict, and our understanding is based on longstanding law-of-war principles. If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel. But that is not the situation we face as of this date.") (quoting Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001)).

Government Information cannot be disclosed to the petitioners' counsel without jeopardizing national security. The panel "provid[ed], just as the Government urged, that it may withhold from the petitioners' counsel any Government Information that is either 'highly sensitive information, or ... pertain[s] to a highly sensitive source or to anyone other than the detainee,'" as long as the Government makes the withheld information available to the court for review *in camera*. *Bismullah II*, 503 F.3d at 142 (quoting *Bismullah I*, 501 F.3d at 187). The panel also stressed that, under the DoD Regulations, "'information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant' comes within the definition of Government Information only if it is 'reasonably available.'" *Bismullah II*, 503 F.3d at 141 (quoting E-1 § E(3)); *see also Bismullah I*, 501 F.3d at 180, 192. And, as the panel observed, an "originating agency" may, pursuant to the DoD Regulations, "decline[] to authorize [classified information] for use in the CSRT process," presumably for reasons of national security, in which case that classified information is deemed "not reasonably available" and accordingly is not Government Information. E-1 § D(2); *see Bismullah II*, 503 F.3d at 142-43. If these options are insufficient to safeguard national security, then the Secretary of Defense, to whom the DTA assigns responsibility for establishing the standards and procedures that govern CSRTs, may revise the DoD Regulations.

Judge Brown criticizes the panel's "reliance" upon the term "reasonably available" because it "provides not a process-based definition, but an abstract legal standard." Stmt. of Brown, J., at 1. The panel, however, did not invent the "reasonably available" standard; it is a feature of the controlling DoD Regulations. Further, the "reasonably available" standard is not

as open-ended as Judge Brown suggests, in important part because, as just noted, the national security agencies may withhold classified information from the Recorder, thereby rendering it "not reasonably available."

In closing, I note that the Supreme Court, in the order granting a writ of *certiorari* in *Boumediene*, stated that "it would be of material assistance to consult any decision" reached by this court in *Bismullah*. Judge Henderson contends that "we do the Supreme Court no favor by not fully considering potentially determinative matters." Stmt. of Henderson, J., at 6 n.6. After merits briefing, oral argument, an opinion by the panel (in which Judge Henderson joined), a petition for rehearing and a response thereto, the petitioners' post-argument letter filed pursuant to FRAP 28(j) and the Government's response thereto, and a supplemental opinion by the panel (in which Judge Henderson again joined), there can be no doubt that all the issues presented in the parties' procedural motions have been aired and fully considered.

GARLAND, *Circuit Judge*, concurring in the denial of rehearing en banc: On June 29, 2007, the Supreme Court granted the detainees' petition for certiorari in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007). In granting that petition, the Court advised the parties that "it would be of material assistance to consult any decision in *Bismullah, et al. v. Gates*, . . . currently pending in the United States Court of Appeals for the District of Columbia Circuit," and that "supplemental briefing will be scheduled upon the issuance of any decision" in that case. *Boumediene v. Bush*, 127 S. Ct. 3078 (2007). The Supreme Court heard oral argument in *Boumediene* on December 5, 2007. Were we to grant en banc review in *Bismullah*, we would plainly delay our decision and hence the Supreme Court's disposition of *Boumediene*. As delaying the latter is contrary to the interests of all of the parties, as well as to the public interest, I concur in the denial of rehearing en banc without reaching the merits.

KAREN LeCraft Henderson, *Circuit Judge*, with whom *Circuit Judges* Sentelle, Randolph, and Kavanaugh join, dissenting from the denial of rehearing en banc: The Detainee Treatment Act of 2005 (DTA) gives exclusive jurisdiction to this Court "to determine the validity of any final decision of [the] Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant." Pub. L. No. 109-148 § 1005(e)(2)(A), 119 Stat. 2680, 2742 (Dec. 30, 2005). While the DTA is not unique in this respect, to me our exclusive jurisdiction underscores the charge given to our *entire* Court to hear and weigh all issues fairly encompassed in determining the validity of the CSRT's decision. Granted, we are now only at the preliminary stage of that determination, that is, resolving procedural motions. In two respects, however, I am convinced that our entire Court should hear and consider the protective order which both sides have asked us to enter. Accordingly, I dissent from the *en banc* denial.[1]

## I. The Scope of the Record on Review.

*Bismullah II* attempts to correct the Government's overreading of *Bismullah I*'s description of the record on review by, first, repeating the panel's reading of the Government Information (defined by DoD Regulation E-1 § E(3)) as including only information "reasonably available" (again, specified by DoD Regulation E-1 § E(3)) and, then, by concluding that "information without regard to whether it is 'reasonably available' is clearly not required by *Bismullah I*." *Bismullah II*, 503 F.3d at 141. *Bismullah II*, however, leaves

---

[1] I note that, as a member of the panel whose original opinion issued on July 20, 2007, *Bismullah v. Gates*, 501 F.3d 178 (D.C. Cir. 2007) (*Bismullah I*), and whose opinion denying the Government's petition for panel rehearing issued on October 3, 2007, *Bismullah v. Gates*, 503 F.3d 137 (D.C. Cir. 2007) (*Bismullah II*), I joined both opinions. Nevertheless, as set forth hereinbelow, matters remain that were unaddressed at the panel level—matters that may be determinative and should at least be heard and weighed by all of us.

intact the panel's original conclusion that "whether the preponderance of the evidence supported the conclusion of the Tribunal, cannot be ascertained without consideration of all the Government Information." *Id*. at 140 (citing *Bismullah I*, 501 F.3d at 185-86.)

Why we are unable to *otherwise* conduct our limited review of the validity of the CSRT's decision is left largely unexplained.[2]   But in the criminal context—where the protections accorded the arrestee are greater and our review is, accordingly, more searching—our Court is plainly able to review the conduct of a preliminary hearing without knowing *all* the evidence the prosecution has gathered.   The reason, of course, is that the preliminary hearing is limited in scope. *Coleman v. Burnett*, 477 F.2d 1187, 1201 (D.C. Cir. 1973) ("The preliminary hearing is not a minitrial of the issue of guilt, . . . 'A preliminary hearing,' the Supreme Court has said, 'is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial.'" (quoting *Barber v. Page*, 390 U.S. 719, 725 (1968))).   So too is the CSRT's mission: that is, at this stage, it must decide simply whether the detainee is an enemy combatant.   Only if he is one can he, presumably, then be held for trial before a military commission.   If we can determine whether the preponderance of the evidence supports a probable cause finding sufficient to hold an arrestee for trial without knowing (much less, reviewing) all the evidence in the prosecutor's possession, can we not do so in reviewing the

---

[2]*Bismullah I* does note that "the court cannot, as the DTA charges us, consider whether a preponderance of the evidence supports the Tribunal's status determination without seeing all the evidence, any more than one can tell whether a fraction is more or less than one half by looking only at the numerator and not at the denominator." *Bismullah I*, 501 F.3d at 186.

evidence supporting the "enemy combatant" designation?[3] And should not all of us at least hear the arguments for and against, especially in the national security context? And especially given the showing the Government has made in both its unclassified and *ex parte* and *in camera* submissions? *Bismullah II*, 503 F.3d at 138 n.1.

Even if we use the administrative agency analogy instead, the Supreme Court has made clear that we have no license to "create" a record consisting of more than the agency itself had before it. *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Doraiswamy v. Sec'y of Labor,* 555 F.2d 832, 839-40 (D.C. Cir. 1976) ("This circumscription [that review be confined to the administrative record], which the Court has consistently honored in other cases, stems from well ingrained characteristics of the administrative process. The administrative function is statutorily committed to the agency, not the judiciary. A reviewing court is not to supplant the agency

---

[3]A detainee is not a criminal defendant. "The capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by 'universal agreement and practice,' are 'important incident[s] of war.'" *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (quoting *Ex parte Quirin*, 317 U.S. 1, 28, 30 (1942)). "The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again." *Id.* (citing Naqvi, Doubtful Prisoner-of-War Status, 84 Int'l Rev. Red Cross 571, 572 (2002) ("[C]aptivity in war is 'neither revenge, nor punishment, but solely protective custody, the only purpose of which is to prevent the prisoners of war from further participation in the war'" (quoting decision of Nuremberg Military Tribunal, *reprinted in* 41 Am. J. Int'l L. 172, 229 (1947))); W. Winthrop, Military Law and Precedents 788 (rev. 2d ed. 1920) ("'A prisoner of war is no convict; his imprisonment is a simple war measure'" (citations omitted))).

on the administrative aspects of the litigation. . . . The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based . . . .") (internal citations, quotations and footnotes omitted); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 793 (D.C. Cir. 1984) (explaining that the record for the reviewing court is limited to "that information before the [agency] *at the time of [its] decision*, . . . thus excluding *ex post* supplementation of the record by either side."); *Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 2 F.3d 408, 433-34 (D.C. Cir. 1993) (same). Again, should we not at least hear and weigh the arguments for and against in the national security context?

## II. Detainees' Counsel's Access to Classified Government Information.

*Bimullah II* also attempts to corral the Government Information, much of which, as the Government's submissions make clear, is classified, that must be disclosed to the detainees' counsel by emphasizing the exceptions from disclosure for information that is "'highly sensitive . . . or . . . pertain[s] to a highly sensitive source or to anyone other than the detainee.'" *Bimullah II*, 503 F.3d at 142 (quoting *Bismullah I*, 401 F.3d at 187) (alteration in original).[4] *Bismullah II*, however, may be unrealistically sanguine about the Government's resulting burden if the presumption is that it must disclose all Government Information except what fits within the exceptions; according to the Government's submissions, which, I submit, we are ill-equipped to second-guess, the exceptions swamp the disclosable information. *Cf. Krikorian v. Dep't of State*, 984 F.2d 461, 464

---

[4]*Bismullah I* had *"presume[d]* counsel for a detainee has a 'need to know' *all* Government Information concerning his client, not just the portions of the Government Information presented to the Tribunal." *Bismullah I*, 501 F.3d at 187 (emphases added).

(D.C. Cir. 1993).[5] But the alternative is not necessarily limited to what *Bismullah II* describes, namely, "the only solution is [for the Government] to turn over none of [the Government Information]." *Bismullah II*, 503 F.3d at 142. If the record on review is more limited as discussed *supra*, the detainees' counsel's access likewise contracts. Again, should we not *all* consider this alternative?

We have heard by unclassified declarations from Michael V. Hayden, Director of the Central Intelligence Agency; Gordon England, Deputy Secretary of the Department of Defense; Keith Alexander, Director of the National Security Agency; Robert Mueller, Director of the Federal Bureau of Investigation; and J. Michael McConnell, Director of National Intelligence. We have heard by Secret declaration from FBI Director Mueller. And we have heard *ex parte* and *in camera* by Top Secret-SCI declarations from CIA Director Hayden and NSA Director Alexander. In the unclassified declarations, the five officials—charged with safeguarding our country while we are now at war—have detailed the grave national security concerns the *Bismullah I* holding presents. "Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." *Hamdi*, 542 U.S. at 531 (citing *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) (noting reluctance of courts "to intrude upon the authority of the Executive in military and national security affairs")). In *Hamdi*, the Government represented that "military officers who are engaged in the serious work of waging battle [will] be

___

[5]I leave aside this Court's likely burden if we do not consider *en banc* the scope of the Government Information disclosable to the detainees' counsel. As *Bismullah II* itself notes, "if it is true that most of the Government Information . . . come[s] within an exception . . ., the practical effect . . . may yet be that our review . . . is in large part *ex parte*." *Bismullah II*, 503 F.3d at 143 n.7.

unnecessarily and dangerously distracted by litigation half a world away, and discovery into military operations [will] both intrude on the sensitive secrets of national defense and result in a futile search for evidence buried under the rubble of war." *Hamdi*, 542 U.S. at 531-32. The High Court agreed, declaring "[t]o the extent that these burdens are triggered by heightened procedures, they are properly taken into account." *Id*. at 532. I believe our Court should likewise take these burdens into account sitting *en banc*.[6] For the foregoing reasons I dissent from the denial of rehearing *en banc* and join Judge Randolph's dissent.

---

[6]I note, in granting the detainees' certiorari petition in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), the Supreme Court advised that "[a]s it would be of material assistance to consult any decision in *Bismullah et al. v Gates*, No. 06-1197, . . . supplemental briefing will be scheduled" once our Court's decision issues. *Boumediene v. Bush*, 127 S. Ct. 3078 (2007). *En banc* review would plainly delay our decision and thus tighten the time frame for the supplemental briefing the *Boumediene* parties must submit. Nonetheless we do the Supreme Court no favor by not fully considering potentially determinative matters, including these herein discussed. Although, as Chief Judge Ginsburg lists, Stmt. of Ginsburg, C.J., at 12, we have shuffled much paper in this case, we have yet to consider—with the benefit of briefing and oral argument—any of the issues raised by the three dissents from the *en banc* denial.

RANDOLPH, *Circuit Judge*, with whom *Circuit Judges* SENTELLE, HENDERSON and KAVANAUGH join, dissenting from the denial of rehearing en banc: It has long been my practice not to write or join opinions on denials of rehearing en banc. *See Indep. Ins. Agents of Am., Inc. v. Clarke*, 965 F.2d 1077, 1080 (D.C. Cir. 1992). I must now depart from that practice. According to affidavits of the Directors of the Central Intelligence Agency, the Federal Bureau of Investigation, and the National Security Agency and the Director of National Intelligence, the court's ruling in these cases endangers national security. The cases deserve to be reheard and reexamined by the full court. I therefore dissent from the denial, by a vote of 5 to 5, of rehearing en banc. Here are the reasons.

The panel opinion denying rehearing asserts that the agencies just mentioned and the Department of Justice, including the Solicitor General, do not understand the original opinion. We think these executive departments understand full well what the panel ordered. The government must file, as the "record" in each detainee review case, vast reams of classified information to be shared presumptively with private defense counsel, regardless whether any of this information was ever presented to the Combatant Status Review Tribunal, whose decision is the subject of judicial review. That order is contrary to the rule and the statute governing the contents of the record in cases such as these, it violates the restrictions on our jurisdiction in the Detainee Treatment Act, and it risks serious security breaches for no good reason.

The Detainee Treatment Act does not specify what shall be in the record when we review Tribunal decisions. This is understandable because a separate statute governs "the contents of the record in all proceedings instituted in the courts of appeals to enjoin, set aside, suspend, modify, or otherwise review or enforce orders of administrative agencies, boards, commissions, and officers." 28 U.S.C. § 2112(a). Subsection (b) of this statute, and Rule 16(a) of the Federal Rules of Appellate

Procedure, which is based on it, make crystal clear that – contrary to the panel's opinions – the record does not include information never presented to the Combatant Status Review Tribunal.[1]   Yet neither of the panel's two opinions even mentions Rule 16(a) or § 2112(a).[2]

Chief Judge Ginsburg, in his opinion concurring in the denial of rehearing en banc, offers two explanations.  The first is that several other provisions in Title 28 – not applicable here – differentiate between an "executive agency" and a "military department." Stmt. of Ginsburg, C.J., at 2-5.  While intended to show that a Combatant Status Review Tribunal is not an

---

[1]The statute provides that the "record to be filed in the court of appeals . . . shall consist of the order sought to be reviewed or enforced, the findings or report upon which it is based, and the pleadings, *evidence*, and proceedings *before the agency*, board, commission, or officer concerned . . .." 28 U.S.C. § 2112(b) (italics supplied).  Rule 16(a) of the appellate rules states the same.  The government's merits brief not only cited Rule 16 but also discussed why the record it filed was in compliance with the rule.  Respondent Br. 54-55.  That discussion sufficiently alerted the panel not only to the rule but also to the statute: the Advisory Committee Notes to Rule 16 state that "[s]ubdivision (a) is based upon 28 U.S.C. § 2112(b)."

[2]The Department of Defense regulation directly on point provides that the "official record of the Tribunal's decision" shall consist of: "(a) A statement of the time and place of the hearing, persons present, and their qualifications; (b) The Tribunal Decision Report cover sheet; (c) The classified and unclassified reports detailing the findings of fact upon which the Tribunal decision was based; (d) Copies of all documentary evidence presented to the Tribunal and summaries of all witness testimony.  If classified material is part of the evidence submitted or considered by the Tribunal, the report will be properly marked and handled in accordance with applicable security regulations; and (e) A dissenting member's summary report, if any." E-2 §§ (C)(10), (C)(8).

3

"agency" for the purposes of § 2112(b), it indicates the opposite. In Title 28, "'agency' includes any department, independent establishment, commission, administration, authority, board or bureau of the United States . . . unless the context shows that such term was intended to be used in a more limited sense." 28 U.S.C. § 451. Chief Judge Ginsburg's citations illustrate how Congress has limited "agency" in other contexts by using modifiers such as "executive" and "federal." Section 2112(b) contains no such limit. A military department is a "department" under § 451, and thus an "agency" under § 2112(b). Therefore, § 2112(b) applies to a Combatant Status Review Tribunal, which certainly falls within the ambit of the broad definition of "agency" in Title 28. The framers of the Administrative Procedure Act concluded that military commissions would be covered as "agencies," unless they were expressly excluded from the Act. 5 U.S.C. § 551(1)(F).[3]

---

[3]The Attorney General's Manual refers to courts martial, military commissions, and other military authorities as "agencies of the United States," *Attorney General's Manual on the Administrative Procedure Act* 10 (1947), and then explains that they have been "specifically exempted" from the APA in what is now 5 U.S.C. § 551(1)(F), *Id.* at 12.

Chief Judge Ginsburg argues that Combatant Status Review Tribunals are *sui generis* and for that reason are exempt from the requirements of the APA. We agree that the APA exempts Combatant Status Review Tribunals, but not because they are *sui generis*. Instead, the detention of enemy combatants, and the review processes related to them, are military "functions" the APA specifically exempts. The writer's opinion in *Al Odah v. United States*, 321 F.3d 1134, 1149 (D.C. Cir. 2003), attached hereto as an addendum, explains why. In any event, Chief Judge Ginsburg's argument misses the point. Our review in this case is controlled not by the APA, but by 28 U.S.C. § 2112. The Chief Judge does not explain why the broad, unmodified term "agency" in § 2112 excludes a Combatant Status Review

4

The Chief Judge's second explanation for disregarding § 2112(b) exposes still another problem with the panel's reasoning. He writes that to follow § 2112(b)'s law governing the contents of the record "would be to preclude the court from discharging the review function assigned to it in the" Detainee Treatment Act. Stmt. of Ginsburg, C.J., at 5. What exactly is this "review function"? Apparently the idea is that the court will look at how well the Recorder did his job in gathering "Government Information" and how well he culled it in presenting the information to the Tribunal as "Government Evidence."[4]  *Id.* at 5-9.

---

Tribunal.

[4]Under Defense Department regulations, "Government Information" is "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant." E-1 § (E)(3). "Government Evidence" is "such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant." E-1 § (H)(4).

The panel did not seem to appreciate the large difference between "information" and "evidence." It stated that "whether the preponderance of the evidence supported the conclusion of the Tribunal, cannot be ascertained without consideration of all the Government Information." *Bismullah v. Gates*, slip op. at 5 (*Bismullah II*), citing *Bismullah v. Gates*, 501 F.3d 178, 186 (D.C. Cir. 2007) (*Bismullah I*). That rationale could not hold and the Chief Judge seems to have abandoned it. In legal proceedings before courts and other adjudicative bodies, the classic definition of "evidence" is "any matter of fact which is furnished to a legal tribunal otherwise than by reasoning, as the basis of inference in ascertaining some other matter of fact." James B. Thayer, *Presumptions and the Law of Evidence*, 3 HARV. L. REV. 141, 143 (1889). Moreover, the Detainee Treatment Act, in speaking of a preponderance of the evidence, refers to "the requirement" that the Tribunal's conclusion be so supported. DTA

Forget for the moment that the Detainee Treatment Act limits our jurisdiction to review of the *Tribunal's* status determination. DTA § 1005(e)(2)(C)(i). Ignore as well that under the controlling regulations it is the Tribunal, not the court, who supervises the Recorder. E-1 § (C)(2). Even so the question remains – how does the court's order requiring the government to assemble a record consisting of all "reasonably available" information bearing on the detainee's status enable the court to determine whether the Recorder adequately performed his job in gathering information? This is an essential question and neither the panel nor Chief Judge Ginsburg has ever given a satisfactory answer to it.

Perhaps the panel envisioned our court examining the thousands of documents[5] making up the "record" on review and seeing how much of this information escaped the Recorder's attention. But the government has pointed out the fallacy in that vision, which contemplates a comparative judgment. The Recorders, operating before Congress passed the Detainee Treatment Act, did not save the information they obtained unless it became part of the permanent record when they presented it to the Tribunal. So even if this were a proper function for our court, it is impossible for us to determine whether any particular

§ 1005(e)(2)(C)(i). The reference is to Defense Department regulation E-1 § (G)(11) dealing with the burden of proof. In context it is clear as a bell that the "evidence" in the regulation and in the Act means the evidence before the Tribunal, not some pile of information the Recorder decided not to present. The panel thus erred in saying that to determine whether there was enough evidence to support the Tribunal's decision, the court had to look through information the Tribunal never saw.

[5]The government predicts that for each detainee, the record envisioned by the panel will consist of "hundreds of thousands[] of documents." Pet. for Rehearing 10.

piece of information was obtained or was not obtained by any particular Recorder in any particular detainee's case.

The original panel opinion offered a different rationale than the one the Chief Judge now proposes. It was that the detainee's counsel would need to see Government Information "to present an argument that the Recorder withheld exculpatory information." *Bismullah I*, 501 F.3d at 185-86. But the panel's remedy far outruns this rationale. Even if one accepted the exculpatory information rationale – which would require the court to disregard § 2112(b) and Rule 16(a) – this would at most lead to a conclusion that the record on review should consist only of the evidence before the Tribunal plus any exculpatory information the government has discovered. Yet the panel has required all information, exculpatory and incriminatory alike, bearing on the detainee's status to be deposited with the court and presumptively made available to defense counsel.

Why? We can be sure that the assembled information cannot be used in our judicial review of the Tribunal's status determination. And we can also be sure that its assembly and filing in this court, and potential sharing with private counsel, gives rise to a severe risk of a security breach. That is the position of the agencies charged with protecting the country against terrorist attacks, who warn that foreign intelligence services will cease cooperating with the United States if the panel opinion stands. Their concerns deserve the attention of the full court on rehearing en banc.

One final point. Judge Garland votes against en banc, not because he thinks the case unimportant, but because he believes it is more important to advance our decision-making in order to assist the Supreme Court. Stmt. of Garland, J., at 1. We think that it is more important to decide the case correctly and that a correct decision would be of more assistance to the High Court.

For the foregoing reasons we dissent from the denial of rehearing en banc.

---

ADDENDUM

RANDOLPH, *Circuit Judge*, *concurring*:

* * *

The United States or its officers may be sued only if there is a waiver of sovereign immunity. *See, e.g.*, *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). We have held that the Alien Tort Act, whatever its meaning, does not itself waive sovereign immunity. *Industria Panificadora, S.A. v. United States*, 957 F.2d 886, 886 (D.C. Cir. 1992) (per curiam); *Sanchez-Espinoza*, 770 F.2d at 207; *see Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980). The detainees therefore rely on the waiver provision in the Administrative Procedure Act, 5 U.S.C. § 702, which states: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity . . . shall not be dismissed . . . on the ground that it is against the United States . . .."

Although relying on the APA's waiver for agencies, the detainees do not identify which "agency" of the United States they have in mind. They have sued the President in each case, but the President is not an "agency" under the APA and the waiver of sovereign immunity thus does not apply to him. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991). This leaves the military. The APA specifically excludes from its definition of "agency" certain functions, among which is

"military authority exercised in the field in time of war or in occupied territory."  5 U.S.C. §§ 551(1)(G), 701(b)(1)(G); *see id.* §§ 553(a)(1) & 554(a)(4), exempting military "functions" from the APA's requirements for rulemaking and adjudication; *United States ex rel. Schonbrun v. Commanding Officer*, 403 F.2d 371, 375 n.2 (2d Cir. 1968) (Friendly, J.).  The district court ruled, in an alternative holding, that because of the military function exclusion, the APA does not waive sovereign immunity.  *Rasul v. Bush*, 215 F. Supp. 2d 55, 64 n.10 (D.D.C. 2002).  I believe this is correct.

Each of the detainees, according to their pleadings, was taken into custody by American armed forces "in the field in time of war."  I believe they remain in custody "in the field in time of war."  It is of no moment that they are now thousands of miles from Afghanistan.  Their detention is for a purpose relating to ongoing military operations and they are being held at a military base outside the sovereign territory of the United States.  The historical meaning of "in the field" was not restricted to the field of battle.  It applied as well to "organized camps stationed in remote places where civil courts did not exist," *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 274 (1960) (Whittaker, J., joined by Stewart, J., concurring in part and dissenting in part).  To allow judicial inquiry into military decisions after those captured have been moved to a "safe" location would interfere with military functions in a manner the APA's exclusion meant to forbid.  We acknowledged as much in *Doe v. Sullivan*, 938 F.2d 1370, 1380 (D.C. Cir. 1991), when then-Judge Ruth Bader Ginsburg stated for the court that the APA's military function exclusion applied to cases in which a court was asked to "review military commands made . . . in the aftermath of [ ] battle."  It is also of no moment that the detainees were captured without Congress having declared war against any foreign state.  "Time of war," as the APA uses it, is not so confined.  The military actions ordered by the

President, with the approval of Congress, are continuing; those military actions are part of the war against the al Qaeda terrorist network; and those actions constitute "war," not necessarily as the Constitution uses the word, but as the APA uses it. *See Campbell v. Clinton*, 203 F.3d 19, 29-30 (D.C. Cir. 2000) (Randolph, J., concurring in the judgment); *Mitchell v. Laird*, 488 F.2d 611, 613 (D.C. Cir. 1973). The detainees are right not to contest this point. To hold that it is not "war" in the APA sense when the United States commits its armed forces into combat without a formal congressional declaration of war would potentially thrust the judiciary into reviewing military decision-making in places and times the APA excluded from its coverage.

\* \* \*

*Al Odah v. United States*, 321 F.3d 1134, 1149-50 (D.C. Cir. 2003) (Randolph, J., concurring).

BROWN, *Circuit Judge*, dissenting from the denial of rehearing en banc: I appreciate the panel's efforts to clarify the Government's production burden in these CSRT reviews. The panel assumes the phrase "reasonably available" adequately defines the scope of the record because that phrase comes from the CSRT regulations. However, because the record so defined does not arise naturally from the proceedings, the panel may have left much to litigate. The Government is clearly uncertain about what information is "reasonably available," and is searching laboriously through "all relevant federal agencies" to make sure it gathers at least that much information. Pet. at 10. The panel has, naturally, refused to opine on whether the results of such an exhaustive search are reasonably available, *Bismullah v. Gates*, 503 F.3d 137, 141 n.3 (D.C. Cir. 2007) (denial of panel rehearing) (*Bismullah II*), but it seems to think that too intensive a search would be unreasonable, *see id.* at 142. The panel avers that it did not require "[a] search for information without regard to whether it is 'reasonably available.'" *Id.* at 141. But reliance on this sort of verbal formulation may confuse rather than clarify the obligation. Using the phrase "reasonably available" provides not a process-based definition, but an abstract legal standard. If the Government must populate the record based on this standard, it will have to conduct a new search for materials that satisfy it. Under the panel's order, the record may be congruent with the universe of information identified by the regulations, but it bears no direct relationship to the CSRT process—or any process at all. Although the panel might have been right to reject the Government's offer of only the record that a CSRT considered, that version of the record is at least the definite product of a process that actually happened.[1] The likely result of relying on a theoretical record

---

[1] As a corollary, reconvening a CSRT, as the panel proposes, *Bismullah II*, 503 F.3d at 141, will only postpone the issue, because the abstract set of Government Information will have no relation to

will be continued litigation over the inclusion or exclusion of various pieces of information, so that any review of the merits of these cases will be substantially delayed. This would be fair to neither the Government nor the detainees.

The denial of rehearing has generated four separate opinions disputing the proper scope of production; this continuing debate suggests the court has not yet found the right paradigm. Although we strain for familiar analogies to guide us, none of them is apt, because they all miss a central point: CSRTs are not adversarial proceedings. Detainees are not represented by advocates, but only by Personal Representatives whose sole duty is to assist, not defend, them. Conversely, the Recorders and the CSRTs have an obligation, under the procedures, to find and examine exculpatory evidence. That being so, it seems improbable that the Government need turn over only the Record of Proceedings compiled after the CSRT, as it originally urged, *Bismullah v. Gates*, 501 F.3d 178, 185 (D.C. Cir. 2007) (*Bismullah I*). On the other hand, to demand everything means engaging this court in *de novo* review of the CSRTs, as the panel acknowledges. *See Bismullah II*, 503 F.3d at 139–40. Is such review what Congress intended when it passed the Detainee Treatment Act?

Congress mandated this court to review the CSRTs. An adversarial appeal from a nonadversarial hearing is an unfamiliar process in this country, but it is common in other parts of the world. Indeed, since the military's prisoner-of-war procedures were developed to implement international law, Army Reg. 190-8 §§ 1-1(b)(3), 1-6(a) (citing Geneva

---

that proceeding either. The court will still review whether the Recorder for the new panel gathered all reasonably available information. *Bismullah I*, 501 F.3d at 185; Stmt. of Ginsburg, C.J., at 5–6.

Convention Relative to the Treatment of Prisoners of War art. 5, Aug. 12, 1949, 6 U.S.T. 3316), it is conceivable that they were intentionally modeled on traditional inquisitorial procedures. Many aspects seem similar, including the role of the Recorder as both judge and investigator. Not only does he prepare the "official record of the Tribunal's decision," Memo. from the Sec'y of the Navy on Implementation of Combatant Status Review Tribunal Procedures Encl. 2 § C(10) (July 29, 2004); he also gathers the Government Information, which includes all "reasonably available information. . . bearing on. . . whether the detainee" is an enemy combatant, *id*. Encl. 1 § E(3), including evidence both for and against that determination. *Cf.* JACQUELINE HODGSON, FRENCH CRIMINAL JUSTICE 30 (2005) (investigating magistrate must "gather[] evidence which might exculpate as well as incriminate the suspect"). Most important for this case, a civil-law inquisition prepares a well-defined record for review, consisting of the material that the magistrate actually gathered. Bron McKillop, *Anatomy of a French Murder Case*, 45 AM. J. COMP. L. 527, 544–46 (1997). Naturally, this record contains significantly less information than what the magistrate *could* have gathered because it was available.

My point is not to hold out continental criminal procedure as the perfect model for CSRT review, although it may be the closest (and may actually have been the original) model for the military's prisoner-of-war tribunals. Nor, of course, is it a source of law, although it can be a useful source of ideas given that the military's prisoner-of-war regulations expressly advert to international law. Nevertheless, this court could define the record in other ways than the "all" required by the panel or the "nothing" offered by the Government, and this definition is one of a set of decisions this court should make about how we are to conduct this novel form of review.

4

I am now convinced we should have begun by discussing the problems much more thoroughly *en banc*. Accordingly, I dissent from the denial of rehearing.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Decided October 3, 2007

No. 06-1197

HAJI BISMULLAH *A/K/A* HAJI BISMILLAH, AND *A/K/A* HAJI
BESMELLA,

HAJI MOHAMMAD WALI, NEXT FRIEND OF HAJI BISMULLAH,
PETITIONERS

v.

ROBERT M. GATES, SECRETARY OF DEFENSE,
RESPONDENT

———

No. 06-1397

HUZAIFA PARHAT, ET AL.,
PETITIONERS

v.

ROBERT M. GATES, SECRETARY OF DEFENSE, ET AL.,
RESPONDENTS

———

On Petition for Rehearing

———

*Peter D. Keisler*, Acting Attorney General, *Paul
Clement*, Solicitor General, *Gregory G. Katsas*, Acting

Associate Attorney General, *Gregory G. Garre*, Deputy Solicitor General, *Jonathan F. Cohn*, Deputy Assistant Attorney General, and *Douglas N. Letter*, *Robert M. Loeb*, *August E. Flentje*, and *Catherine Y. Hancock*, Attorneys, U.S. Department of Justice, were on the petition for rehearing for respondent.

*John B. Missing*, *Jeffrey I. Lang,* and *Jennifer R. Cowan*, for Huzaifa Parhat, et al., and *Sabin Willett*, *Rheba Rutkowski*, *Neil McGaraghan*, *Jason S. Pinney*, and *Susan Baker Manning* for Haji Bismullah, et al., were on the joint opposition to the petition for rehearing.

Before: GINSBURG, *Chief Judge*, and HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*:  The petitioners are eight men detained at the Naval Station at Guantánamo Bay, Cuba.  Each petitioner seeks review under the Detainee Treatment Act (DTA), Pub. L. No. 109-148, § 1005(e)(2), 119 Stat. 2742-43 (Dec. 30, 2005), of the determination by a Combatant Status Review Tribunal (CSRT or Tribunal) that he is an "enemy combatant."  In our opinion of July 20, 2007, we addressed various procedural motions filed by the Government and the petitioners to govern our review of the merits of the detainees' petitions. *Bismullah v. Gates* (*Bismullah I*), No. 06-1197.  The Government then petitioned for rehearing or, in the alternative, suggested rehearing *en banc*.  The petition for rehearing addresses two distinct aspects of *Bismullah I*: the scope of the record on review before the court; and the extent to which the Government must disclose that record to the petitioners'

counsel.[1]  We deny the Government's petition for rehearing for the reasons discussed below.

I.  The Scope of the Record on Review.

As we explained in *Bismullah I*, the Secretary of Defense, in a July 2004 Memorandum for the Secretary of the Navy, established skeletal procedures for the conduct of a CSRT proceeding with respect to a foreign national held at Guantánamo to "review the detainee's status as an enemy combatant."  Slip Op. 4.  The Secretary of the Navy then issued a memorandum elaborating upon those procedures in three enclosures, known as E-1, E-2, and E-3 (collectively, the DoD Regulations).  *See id.*  The DoD Regulations provide that the Tribunal is "authorized," insofar as is relevant here, to

> [r]equest the production of such reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant, including information generated in connection with the

---

[1]  In support of its petition for rehearing, the Government attached the unclassified declarations of Michael V. Hayden, Director of Central Intelligence; Gordon England, Deputy Secretary of Defense; Keith Alexander, Director of the National Security Agency; Robert Mueller, Director of the Federal Bureau of Investigation; and J. Michael McConnell, Director of National Intelligence.  The Government also attached the Secret declaration of Mr. Mueller.  In addition, the Government sought leave to file *ex parte* and *in camera* the Top Secret-SCI declarations of Mr. Alexander and Mr. Hayden for review by judges only.  Because the Top Secret-SCI declarations are not material to our disposition of the Government's petition for rehearing, we deny the motion for leave to file the Top Secret-SCI declarations insofar as it pertains to the Government's petition for rehearing by the panel.

initial determination to hold the detainee as an enemy combatant and in any subsequent reviews of that determination, as well as any records, determinations, or reports generated in connection with such proceedings (cumulatively called hereinafter "Government Information").

E-1 § E(3); *see* Slip Op. 5. The Recorder must collect the Government Information, examine it, and then decide which information to pass on to the Tribunal. Slip Op. 5; E-2 § C(1). The Recorder is required to

> present to the Tribunal such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant ... (the evidence so presented shall constitute the "Government Evidence") ... [and, in] the event the Government Information contains evidence to suggest that the detainee should not be designated as an enemy combatant, the Recorder shall also separately provide such evidence to the Tribunal.

E-1 § H(4); E-2 § B(1), C(6).

In *Bismullah I* the Government argued that the record on review should consist solely of the Record of Proceedings, which, under the DoD Regulations, includes only such Government Information as the Recorder forwarded to the Tribunal. *See* Slip Op. 6, 12; E-1 § I(4); E-2 § C(8). Taking the view that the record on review should consist of "all evidence reasonably available to the Government," the petitioners contended that the record should include all of the Government Information. Slip Op. 10. We held the record on review must include all the Government Information because the DTA requires the court to review the CSRT determination to ensure

it is "consistent with the standards and procedures specified by the Secretary of Defense ... (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence ... )." DTA § 1005(e)(2)(C).[2] Slip Op. 13. Whether the Recorder selected to be put before the Tribunal all exculpatory Government Information, as required by the DoD Regulations, and whether the preponderance of the evidence supported the conclusion of the Tribunal, cannot be ascertained without consideration of all the Government Information. Slip Op. 13-15.

In its petition for rehearing, the Government asserts that *Bismullah I* defined the record on review to include "a broad and amorphous class of material" out of "a desire to ensure that exculpatory information was properly considered." The Government accordingly objects to *Bismullah I* on three grounds.

First, the Government contends that the Congress "modeled" the DTA on Army Regulation 190-8, which governs how the Army determines the status of an enemy detainee who claims prisoner-of-war status under the Geneva Conventions. The Government asserts that Army Regulation 190-8 does not require "that the military turn over all information in any file concerning a detainee" to the military tribunal that determines his status as a prisoner of war. Putting aside a most obvious distinction that status determinations made pursuant to Army Regulation 190-8 are not subject to direct judicial review, we believe the more important point is that neither does *Bismullah*

---

[2] We also held the record on review includes any evidence submitted to the Tribunal by the detainee or his Personal Representative, Slip Op. 15, a matter not in dispute here. Nor is it disputed that any material requested by the Tribunal pursuant to the DoD Regulations is part of the record on review.

*I* require the Government to turn over to the CSRT all information in its files concerning a detainee; adopting the definition of Government Information exactly as it appears in the DoD Regulations themselves, the court in *Bismullah I* required the Government to collect (and preserve for judicial review) only the relevant information in its possession that is reasonably available. Slip Op. 13-15. In any event, Army Regulation 190-8 is irrelevant because this court is bound not by it but by the DTA, which charges the court to ensure that the CSRT's determination is consistent with the DoD Regulations and that the conclusion of the Tribunal is supported by a preponderance of the evidence.

Second, the Government contends that *Bismullah I* imposed upon the Government a greater obligation to "turn over" exculpatory evidence for a detainee than the Due Process Clauses of the Constitution impose upon prosecutors in criminal trials. *See Brady v. Maryland*, 373 U.S. 83 (1963). Whether the Government is correct – a matter upon which we express no view – is irrelevant for the same reason that Army Regulation 190-8 is irrelevant: as just noted, the DTA requires that the record on review include all the Government Information.

Third, the Government argues – and this seems to be its only real and practical concern – that if *Bismullah I* "is allowed to stand, the Government ... will be required to undertake searches of all relevant Department of Defense ('DoD') components and all relevant federal agencies in an effort to recreate a 'record' that is entirely different from the record before the Tribunal that made the decision at issue in a DTA case." The burden of collecting all these materials, the Government says, would be so great that it would "divert limited resources and sidetrack the intelligence community from performing other critical national security duties during a time of war." For example, the Government reports that its searches

of certain databases for relevant documents are yielding "tens of thousands, and in many cases hundreds of thousands, of documents" relating to a given detainee. According to Deputy Secretary of Defense Gordon England, two offices within the DoD have expended well over 2000 man-hours in a recent effort to collect material relating to six detainees who have petitioned for review of their status determination.

The Government, it seems, is overreading *Bismullah I* and underreading the DoD Regulations. Those regulations provide that "information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant" comes within the definition of Government Information only if it is "reasonably available." E-1 § E(3); *see* Slip Op. 5. In its petition for rehearing, the Government adverts repeatedly to this limitation upon the scope of Government Information. Yet, the Government reports that it "is now conducting ... entirely new searches of all relevant DoD components and all relevant federal agencies." A search for information without regard to whether it is "reasonably available" is clearly not required by *Bismullah I*.

Indeed, the Government states elsewhere in its petition for rehearing that it does "not believe that the information" it is now seeking "is properly considered 'reasonably available.'"[3] Apparently, the Government is searching for all relevant information without regard to whether it is reasonably available because it did not retain all the Government Information that the

---

[3] We express no view as to whether any of the information the Government is seeking is not "reasonably available."

Recorder collected.[4] The Government has consequently determined that it must now search for relevant information without regard to whether the information is reasonably available "because [it] can conceive of no other comprehensive method to ensure that [it] identif[ies] information that the Recorder could have examined." The Government explains that it did not retain all the Government Information because, "[a]t the time, Recorders had no reason to believe that DoD would be required to produce (or explain post hoc) what was *not* provided to the Tribunal." We note in the Government's defense that CSRTs made hundreds of status determinations, including those under review in the present cases, before the DTA was enacted in December 2005 and therefore without knowing what the Congress would later specify concerning the scope and nature of judicial review.

Be that as it may, if the Government cannot, within its resource constraints, produce the Government Information collected by the Recorder with respect to a particular detainee, then this court will be unable to confirm that the CSRT's determination was reached in compliance with the DoD Regulations and applicable law. *See* Slip Op. 13 n.\*. The Government does have an alternative: It can abandon its present course of trying to reconstruct the Government Information by surveying all relevant information in its possession without regard to whether that information is reasonably available, and instead convene a new CSRT. If the Government elects to

---

[4] The Government tells us "there is no readily accessible set of Government Information for completed CSRTs" and that the Government Information is not "sitting in a file drawer." Thus, it seems that, having collected the Government Information and selected the Government Evidence for the Tribunal to see, the Recorder then did not retain that portion of the Government Information he did not forward to the Tribunal.

convene a new CSRT, it will have to collect only the Government Information specified by the DoD Regulations – that is, the relevant information in its possession that is then *reasonably available*.[5]

In summary, the record on review must include all the Government Information, as defined by the DoD Regulations. If the Government did not preserve that entire body of information with respect to a particular petitioner, then it will have either to reassemble the Government Information it did collect or to convene a new CSRT, taking care this time to retain all the Government Information.

II. Access by the Petitioner's Counsel to Classified Government Information.

The Government also objects to *Bismullah I* insofar as it requires the Government to turn over Government Information

---

[5] The Government apparently has convened a second or successive CSRT for a number of detainees. *See* Mark Denbeaux et al., *No-Hearing Hearings, CSRT: The Modern Habeas Corpus? An Analysis of the Proceedings of the Government's Combatant Status Review Tribunals at Guantánamo* 37-39. In addition, pursuant to the DTA, Department of Defense regulations provide that a new CSRT may be convened in the event that material "new evidence" comes to light. DTA § 1005(a)(3); Department of Defense, Office for the Administrative Review of the Detention of Enemy Combatants (OARDEC) at U.S. Naval Base Guantánamo Bay, Cuba, Instruction 5421.1(4)-(5) (May 7, 2007). According to its Director, Frank Sweigart, OARDEC has convened at least one new CSRT pursuant to Instruction 5421.1. *See Al Ginco v. Gates*, No. 07-1090 (D.C. Cir.), Decl. of Frank Sweigart ¶ 4 (Sept. 13, 2007). We express no view as to the availability of any other type of relief in a case in which the Government did not preserve the Government Information with respect to a particular detainee.

to the petitioners' counsel. The Government sees two problems with this: The disclosure of classified Government Information "could seriously disrupt the Nation's intelligence gathering programs"; and the burden of reviewing all the Government Information to determine whether it must be turned over is so great that it will "divert limited resources and sidetrack the intelligence community from performing other critical national security duties during a time of war."

In *Bismullah I*, we dealt with the Government's concern about disclosure by providing, just as the Government urged, that it may withhold from the petitioners' counsel any Government Information that is either "highly sensitive information, or ... pertain[s] to a highly sensitive source or to anyone other than the detainee." Slip Op. 16-17.[6] The Government's need to review the Government Information in order to determine whether it fits within any of these three exceptions gives rise to the Government's present concern about the burden of complying with *Bismullah I*.

Although the Government represented in its brief and at oral argument in *Bismullah I* that it would need to withhold "only a small amount of information" from a detainee's counsel, the Government now indicates that a substantial amount of the Government Information comes within one or another of the three exceptions, thereby "exponentially increas[ing] the magnitude of" its review of Government Information to determine what to withhold. The Government's petition is unclear as to why it now anticipates so much more Government Information will be non-disclosable. Perhaps it is because, as

---

[6] To the extent the Government now suggests that certain information may be too sensitive to disclose even to the court, we leave that issue for case-by-case determination upon *ex parte* motion filed by the Government.

discussed above, the Government has been searching for all relevant information without regard to whether it is reasonably available. According to the DoD Regulations, "[c]lassified information ... which the originating agency declines to authorize for use in the CSRT process is not reasonably available." E-1 § D(2). Consequently, if the Government convenes a new CSRT and the Recorder collects as Government Information only the information in its possession that is both relevant and "reasonably available," then the amount of information to be redacted may indeed be as small as the Government anticipated earlier. We note, however, that, according to the DoD Regulations, when an originating agency withholds relevant information, it must "provide either an acceptable substitute for the information requested or a certification to the Tribunal that none of the withheld information would support a determination that the detainee is not an enemy combatant." E-1 § E(3)(a).

In any event, the proportion of the Government Information that may be withheld from the petitioners' counsel should not affect to an appreciable degree the burden upon the Government of producing the Government Information to the petitioners' counsel. Regardless of how much ultimately may be withheld, the Government will have to conduct the same review of the Government Information in order to make that determination; so much was inherent in the Government's proposed standard for withholding information, which we adopted. Thus, the real import of the Government's argument seems to be that having to review the Government Information to determine whether it must be disclosed creates a substantial burden for the Government and therefore, because the Government obviously cannot indiscriminately turn over all of the Government Information to the petitioners' counsel, the only solution is to turn over none of it. As we explained in *Bismullah I*, however, entirely *ex parte* review of a CSRT determination is

inconsistent with effective judicial review as required by the DTA and should be avoided to the extent consistent with safeguarding classified information. Slip Op. 13, 16-17.[7]

---

[7] Nonetheless, if it is true that most of the Government Information will come within an exception to the requirement that the petitioners' counsel be given access to the Government Information, then the practical effect of the exceptions may yet be that our review of a CSRT determination is in large part *ex parte*.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 15, 2007          Decided July 20, 2007

No. 06-1197

HAJI BISMULLAH *A/K/A* HAJI BISMILLAH, AND *A/K/A* HAJI BESMELLA,

HAJI MOHAMMAD WALI, NEXT FRIEND OF HAJI BISMULLAH, PETITIONERS

v.

ROBERT M. GATES, SECRETARY OF DEFENSE, RESPONDENT

———

No. 06-1397

HUZAIFA PARHAT, ET AL., PETITIONERS

v.

ROBERT M. GATES, SECRETARY OF DEFENSE, ET AL., RESPONDENTS

———

On Motions

———

*Jeffrey I. Lang* argued the cause for petitioners Haji Bismullah, et al. *Sabin Willett* argued the cause for petitioners

Huzaifa Parhat, et al. With them on the briefs were *Rheba Rutkowski*, *Neil G. McGaraghan*, *Jason S. Pinney*, *Susan B. Manning*, *John B. Missing*, *Jennifer R. Cowan*, and *Jill van Berg*.

*Douglas N. Letter*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, *Gregory G. Katsas*, Principal Deputy Associate Attorney General, *Jonathan F. Cohn*, Deputy Assistant Attorney General, and *Robert M. Loeb* and *August E. Flentje*, Attorneys.

Before: GINSBURG, *Chief Judge*, and HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the court filed by *Chief Judge* GINSBURG.

Concurring opinion filed by *Circuit Judge* ROGERS.

GINSBURG, *Chief Judge*: Petitioners are eight men detained at the Naval Station at Guantánamo Bay, Cuba. Each petitioner seeks review of the determination by a Combatant Status Review Tribunal (CSRT or Tribunal) that he is an "enemy combatant." In this opinion we address the various procedural motions the parties have filed to govern our review of the merits of the detainees' petitions. The petitioners as a group and the Government each propose the court enter a protective order to govern such matters as access to and handling of classified information; the petitioners move to compel discovery and for the appointment of a special master; and the Government asks the court to treat the seven petitioners who filed the joint petition in *Parhat v. Gates* (No. 06-1397) as though each had filed a separate petition to review his status determination.

In order to review a Tribunal's determination that, based

upon a preponderance of the evidence, a detainee is an enemy combatant, the court must have access to all the information available to the Tribunal. We therefore hold that, contrary to the position of the Government, the record on review consists of all the information a Tribunal is authorized to obtain and consider, pursuant to the procedures specified by the Secretary of Defense, hereinafter referred to as Government Information and defined by the Secretary of the Navy as "such reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant," which includes any information presented to the Tribunal by the detainee or his Personal Representative.

In addition, we must implement such measures to govern these proceedings as are necessary to enable us to engage in meaningful review of the record as defined above. Therefore, we will enter a protective order adopting a presumption, as proposed by the petitioners, that counsel for a detainee has a "need to know" the classified information relating to his client's case, except that the Government may withhold from counsel, but not from the court, certain highly sensitive information. The protective order also will provide that the Government may inspect correspondence from counsel to a detainee, including "legal mail," and redact anything that does not pertain to the events leading up to the detainee's capture and culminating in the conduct of his CSRT, including such events in between as bear upon the decision of the Tribunal or our review thereof. Finally, the protective order will provide that a lawyer offering his or her services may, as the petitioners propose, have up to two visits with a detainee in order to obtain the detainee's authorization to seek review of the CSRT's determination of his status.

Before entering the protective order, the court will give the parties an opportunity to suggest changes.

4

## I. Background

Each petitioner is a foreign national captured abroad and held at Guantánamo, seeking review of a decision of a CSRT determining that he is an "enemy combatant" and therefore subject to detention for the duration of hostilities. Haji Bismullah was captured in Afghanistan in 2003. Huzaifa Parhat and the six other detainees joining his petition are ethnic Uighurs who allege they were captured in Pakistan in approximately December 2001.

### A. The Regulations

In a July 2004 Memorandum for the Secretary of the Navy, the Secretary of Defense established skeletal procedures for the conduct of CSRT proceedings with respect to foreign nationals held at Guantánamo to "review the detainee's status as an enemy combatant." The Secretary of the Navy, who was "appointed to operate and oversee [the CSRT] process," promptly issued a memorandum specifying detailed procedures (Navy Memorandum), which are still in effect.[*]

Pursuant to those procedures, a CSRT reviews the determination, made after "multiple levels of review by military officers and officials of the Department of Defense," (E-1 § B) that a detainee is an "enemy combatant," defined as "an individual who was part of or supporting Taliban or Al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners." (E-1 § B) A Tribunal is composed of "three neutral commissioned officers" who were

---

[*] The Secretary of the Navy attached to his memorandum three "enclosures," to which we refer below in our citations to the CSRT procedures as "E-1," "E-2," and "E-3."

not involved in the "apprehension, detention, interrogation, or previous determination of status of the detainee[]." (E-1 § C(1)) The Tribunal is to "determine whether the preponderance of the evidence supports the conclusion that each detainee meets the criteria to be designated as an enemy combatant." (E-1 § B) There is a rebuttable presumption that the Government Evidence, defined as "such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant" (E-1 § H(4)) is "genuine and accurate" (E-1 § G(11)).

The Tribunal is authorized to request the production of "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant," (E-1 § E(3)) and the Recorder, a military officer, is charged with obtaining from government agencies and reviewing all such Government Information (E-2 § C(1)). The Recorder must present, orally or in documentary form (E-2 § C(6)), both the Government Evidence and, if any there be in the Government Information, all "evidence to suggest that the detainee should not be designated as an enemy combatant." (E-1 § H(4), E-2 § B(1)) In advance of the Tribunal hearing, the Recorder must prepare an unclassified summary of the relevant Government Information and provide the summary to the detainee's Personal Representative, also a military officer. (E-2 § C(2), (4))

Each detainee's Personal Representative reviews the Government Evidence the Recorder plans to present to the Tribunal (E-3 § C(3)), has access to the Government Information (E-3 § C(2)), and meets with the detainee to explain the CSRT process. The Personal Representative may not, however, share classified information with the detainee. (E-3 § C(4)) The Personal Representative "shall present information to the Tribunal if the detainee so requests" and "may, outside the

presence of the detainee, comment upon classified information submitted by the Recorder." (E-3 § C(5)) The detainee may testify or introduce relevant documentary evidence at the hearing, but may not be compelled to answer questions. (E-1 § F(6)-(7)) He also may present the testimony of any witness who is "reasonably available and whose testimony is considered by the Tribunal to be relevant." (E-1 § F(6))

After the hearing, the Recorder compiles a "Record of Proceedings," consisting of (1) a statement of the time and place of the hearing and the names of those present; (2) the Tribunal Decision Report cover sheet,[*] which is accompanied by (a) the classified and unclassified reports made by the Recorder "upon which the Tribunal decision was based" and (b) copies of all documentary evidence presented to the CSRT; (3) a summary prepared by the Recorder of each witness's testimony; and (4) the summary report written by any dissenting member of the Tribunal. (E-2 § C(8), E-1 § G(12))

Each Tribunal has a "Legal Advisor" with whom the members may consult regarding legal, evidentiary, procedural, and like matters. (E-1 § C(4)) The Legal Advisor reviews for legal sufficiency both the CSRT's rulings on whether witnesses and evidence are reasonably available and its ultimate determination of the detainee's status. (E-1 § I(7)) The Legal Advisor forwards the Record of Proceedings to the "Director, CSRT," (E-1 § I(5)) who reviews the decision as well. (E-1 § I(8), E-2 § C(10)) If approved by the Director, CSRT, then the decision becomes final. (E-1 § I(8))

---

[*] A Tribunal member designated by the Tribunal President (E-1 § H(9)) must "document the Tribunal's decision on the [CSRT] Report cover sheet ... which [serves] as the basis for the Recorder's preparation of the Tribunal record."

7

B. The Statutes

In December 2005 the President signed into law the Detainee Treatment Act (DTA), Pub. L. No. 109-148, § 1005(e)(2)(A), 119 Stat. 2742-43, which vests in this court exclusive jurisdiction "to determine the validity of any final decision of a [CSRT] that an alien is properly detained as an enemy combatant." Section 1005(e)(2)(C) of the Act provides:

> The jurisdiction of the United States Court of Appeals for the District of Columbia Circuit on any claims with respect to an alien under this paragraph shall be limited to the consideration of —
>
> (i) whether the status determination of the Combatant Status Review Tribunal with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence); and
>
> (ii) to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States.

Soon after arriving at Guantánamo, many a detainee, either personally or through a "next friend" acting on his behalf, sought release by filing a petition for a writ of habeas corpus in the district court. Beginning in January 2006, after the DTA was enacted, some detainees, including the petitioners, filed in this court petitions seeking both review of a status determination by

a CSRT and a writ of habeas corpus. *See, e.g.*, *Paracha v. Gates*, No. 06-1038. In October 2006 the Congress passed and the President signed into law the Military Commissions Act (MCA), Pub. L. No. 109-366, § 7, 120 Stat. 2635-36, which stripped the district court of jurisdiction over habeas petitions filed by or on behalf of "an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." MCA § 7(a), 28 U.S.C. § 2241(e)(1). Meanwhile, we had stayed the petitions filed in the court of appeals, including those of Bismullah and the Parhat Petitioners, pending this court's decision in *Boumediene v. Bush*, 476 F.3d 981, 990-91, *cert. denied*, 127 S. Ct. 1478, 167 L. Ed. 2d 578, *cert. granted*, 75 U.S.L.W. 3707 (U.S. June 29, 2007) (No. 06-1195). In that case we held that, because the common law writ of "habeas corpus would not have been available in 1789 to aliens without presence or property within the United States," the Congress did not violate the Suspension Clause of the Constitution, U.S. Const. art. I, § 9, cl. 2, when it stripped the federal district court of jurisdiction to hear any habeas petition filed by "an alien detained by the United States." We now take up the motions pending in the petitioners' DTA cases.

## C. The Motions

In order to resolve preliminary issues before this court reviews the merits of their claims, all the petitioners filed motions to (1) enter the protective order previously entered by the district court in all habeas cases brought by Guantánamo detainees (Status Quo Order); (2) compel discovery, allowing the petitioners to gather all evidence available to the Government at the time the CSRT was held and to present to the court such evidence as was not presented to the CSRT; and (3) appoint a special master to hold hearings and make factual findings, as necessary to address disputes arising from the proposed

protective and discovery orders. In his motion to compel discovery, Bismullah also seeks counsel access to (1) the Record of Proceedings (classified and unclassified) before his CSRT; (2) the Government Information regarding Bismullah; (3) any statements or letters in support of Bismullah; (4) other documents relating to Bismullah's CSRT, including "records, notes, memoranda and correspondence of the Tribunal members, Recorder, Personal Representative, or other person who participated in Bismullah's CSRT"; and (5) other "reasonably available documents or information in the possession of the U.S. government" bearing upon whether Bismullah meets the criteria to be designated an enemy combatant.

In their motion to compel discovery, the Parhat Petitioners seek counsel access to (1) the CSRT records (classified and unclassified) for all seven Parhat Petitioners and for 13 other Uighur men allegedly taken into custody at the same time and place; (2) records created in Kandahar, Afghanistan or Guantánamo regarding any Parhat Petitioner's status as an enemy combatant; (3) records of the State Department's effort to persuade foreign governments to grant asylum to any of the 20 Uighurs, including the Parhat Petitioners; (4) the Government's files regarding interrogation of each Parhat Petitioner; (5) records concerning the conduct of the Recorder in all CSRT proceedings concerning any of the Parhat Petitioners; (6) records concerning any visit to Guantánamo of any official of the People's Republic of China in order to interrogate any Uighur detainee, upon which interrogation the petitioners are concerned the Tribunal may have relied in designating them enemy combatants; and (7) records concerning any Parhat Petitioner's affiliation with the East Turkistan Islamic Movement, which the Government designated a "terrorist organization" pursuant to 8 U.S.C. § 1182(a)(3)(B)(vi)(II) more than two years after the Parhat Petitioners allege they were captured, *see* 69 Fed. Reg. 23,555 (2004), and with which the Parhat Petitioners allege, in

apparent anticipation of the Government Evidence, they have no affiliation.

For its part, the Government moves the court to enter a substantially revised version of the protective order entered by the district court (Government's Proposed Order), before the entry of which it apparently refuses to turn over to counsel for the petitioners any classified information and "any information designated by the Government as protected information." The Government also proposes the court treat the petition filed by the seven Parhat Petitioners as seven separate petitions.

## II. Analysis

The parties fundamentally disagree about what constitutes the record to which this court must look as it reviews a CSRT's determination that a petitioner is an enemy combatant. The parties agree that the court should enter a protective order before the Government gives counsel for the petitioners (all of whom have the requisite security clearance) access to classified and protected information, and that the protective order must provide a method for counsel to communicate to a detainee nonclassified but confidential information, in writing and in person. The parties disagree, however, over several particulars. The petitioners ask the court to enter the protective order entered by the district court in the aforementioned habeas cases, and the Government proposes a substantially different order.

### A. The Record

The petitioners argue the court must look beyond the Record of Proceedings and consider all evidence reasonably available to the Government, which may include evidence neither the Recorder nor the detainee's Personal Representative nor the detainee put before the CSRT. In addition, they point out that

many of the procedures specified by the Department of Defense for the conduct of a CSRT address steps to be taken before the hearing, and argue that therefore the court must have available to it information sufficient to enable review of a detainee's claim that the Government did not comply with a pre-hearing procedure. For example, Bismullah contends, on information and belief, that the Recorder for his proceeding failed to gather and examine potentially exculpatory evidence and to present that evidence to the Tribunal. Bismullah also alleges the Tribunal acted arbitrarily and capriciously by, for example, ruling that Bismullah's brother was not "reasonably available" to testify or submit an affidavit. The Parhat Petitioners similarly allege the Recorder failed to present the Tribunal with statements made by military interrogators advising them as early as 2003 that they soon would be released. The Parhat Petitioners also seek information regarding other Uighur detainees in order to support their claims that the Government acted arbitrarily by finding the Parhat Petitioners to be enemy combatants while finding similarly situated detainees were not enemy combatants. Finally, the petitioners contend that, even if the court does not review the Government's compliance with pre-hearing procedures, they are entitled to discovery directed at determining whether exculpatory material was withheld from the Tribunal.

The petitioners propose not only to compel discovery but also to supplement the record with such evidence as they discover relevant to their claims. As counsel for the petitioners said at oral argument, their request is "not strictly speaking for discovery [but] for the court to have the complete record before it." Here they rely upon *NRDC v. Train*, 519 F.2d 287, 291-92 (D.C. Cir. 1975), in which we held that after the plaintiffs made a "substantial showing" that the EPA had not filed with the court the entire administrative record of the matter under review, they were "entitled to an opportunity to determine, by limited discovery, whether any other documents which [were] properly

part of the administrative record had been withheld." Thus, the petitioners contend the court appropriately considers supplemental extra-record information when the "procedural validity of the [agency's] decision" is "under scrutiny," *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), because, for example, the agency excluded documents that might have been adverse to its decision, *see Kent County, Del. Levy Court v. EPA*, 963 F.2d 391, 395-96 (D.C. Cir. 1992).

The Government's position is that the record before the court is properly limited to the Record of Proceedings, as compiled by the Recorder. According to the Government, the plurality in *Hamdi v. Rumsfeld*, 542 U.S. 507, 538 (2004)*,* "rejected free-wheeling discovery" for even a citizen detained as an alleged enemy combatant as long as there was a formal military proceeding "akin" to a CSRT in which the detainee could present his version of the facts. The Government believes that by directing this court to "determine the validity of any final decision of a Combatant Status Review Tribunal," DTA § 1005(e)(2)(A), the Congress intended to "evoke[] this Court's familiar function of reviewing a final administrative decision based upon the record before the agency." In support of that position and the lack of any need for discovery, the Government contends the Record of Proceedings is sufficient for meaningful review by the court, because a ruling on the reasonable availability of a witness or of evidence must be made on the record; the Personal Representative's communication to the detainee is largely scripted, leaving no need to produce "[his] notes, memoranda and correspondence"; and the actions of the Recorder, whose task is routine and subject to a strong "presumption of regularity," is subject to challenge by the detainee, who may testify on his own behalf, and by the detainee's Personal Representative, who may review the Government Information.

We approach questions concerning the content of the record we are to review mindful that the DTA directs this court to "determine the validity" of a Tribunal's "status determination" with particular reference to whether it was made "consistent with the standards and procedures specified by the Secretary of Defense, ... including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence." DTA § 1005(e)(2). As the petitioners point out, many of the procedures specified by the Secretary relate to steps the Recorder and others must take before the Tribunal holds a hearing. In order to review compliance with those procedures, the court must be able to view the Government Information with the aid of counsel for both parties; a detainee's counsel who has seen only the subset of the Government Information presented to the Tribunal is in no position to aid the court. There is simply no other way for the counsel to present an argument that the Recorder withheld exculpatory evidence from the Tribunal in violation of the specified procedures. Even if the Recorder's actions are entitled to a presumption of regularity, as the Government maintains — but which is not at all clear because a CSRT does not have the transparent features of the ordinary administrative process and the Recorder is not the final agency decisionmaker, *see Martino v. U.S. Dep't of Agric.*, 801 F.2d 1410, 1412-13 (D.C. Cir. 1986) — that presumption is not irrebuttable,[*] *see, e.g.*, *NRDC v. SEC*, 606 F.2d 1031, 1049 n.23

---

[*] Insofar as the task of gathering Government Information was performed by someone other than the Recorder, Decl. of Rear Admiral (Retired) James M. McGarrah ¶¶ 4-6 (May 31, 2007), as our concurring colleague points out may have happened, or the Recorder has failed altogether to gather certain Government Information, as Bismullah alleges, a panel reviewing the merits of a CSRT status determination will be in a position to resolve whether the procedure followed was "consistent with the standards and procedures specified by the Secretary of Defense for [a CSRT]." DTA § 1005(e)(2)(C)(i).

(D.C. Cir. 1979) (listing methods of rebutting presumption of regularity); but it would be irrebuttable, in effect, if neither petitioners' counsel nor the court could ever look behind the presumption to the actual facts. In addition, the court cannot, as the DTA charges us, consider whether a preponderance of the evidence supports the Tribunal's status determination without seeing all the evidence, any more than one can tell whether a fraction is more or less than one half by looking only at the numerator and not at the denominator.

The petitioners argue that once counsel have seen the Government Information relative to a particular detainee, they may need discovery in order to ensure "the Government has actually collected all [documents it is required to collect]." They believe, that is, they may be able to make a particularized showing of need for specific documents in addition to those obtained by the Recorder.

We deny the petitioners' motions to compel discovery, without prejudice to renewal, because they have not made a showing sufficient to justify compelling discovery at this stage of these proceedings. First, the petitioners do not need discovery in order to challenge a CSRT's ruling that a requested witness or item of evidence was not "reasonably available"; as the Government points out, that ruling must be made on the record, which should be sufficient to determine whether the Tribunal acted in accordance with the specified procedures. Nor does a detainee petitioner need information regarding the conduct of another detainee's CSRT proceeding. Such information is not relevant to our review, and therefore not necessary for a counsel's representation of his detainee client; the Act authorizes this court to "determine the validity of any final decision of a [CSRT]," DTA § 1005(e)(2)(A), and our jurisdiction under the Act is expressly "limited to the consideration of" whether a detainee's status determination was "consistent with the

standards and procedures specified by the Secretary of Defense for [a CSRT]," including the requirement that the Tribunal's status determination be supported by a preponderance of the evidence, DTA § 1005(e)(2)(C)(i). The Act does not authorize this court to determine whether a status determination is arbitrary and capricious because, to use the petitioners' example, it is inconsistent with the status determination of another detainee who was detained under similar circumstances. If a preponderance of the evidence in the record — broadly understood to include the Government Information and not just the Government Evidence, plus any evidence submitted by the detainee or his Personal Representative — supports the Tribunal's finding, then the Tribunal's status determination must be upheld, provided, of course, the determination was otherwise made in accordance with the "standards and procedures specified by the Secretary of Defense." DTA § 1005(e)(2)(C)(i).

B. The Protective Order

Pursuant to the All Writs Act, 28 U.S.C. § 1651, which authorizes the court to issue "all writs necessary or appropriate in aid of [its] jurisdiction[]," we shall enter a protective order resolving the points in contention between the parties in such a way as to ensure the parties do not frustrate the court's ability to review a CSRT determination under the DTA. *Cf. Telecom. Research & Action Ctr. v. FCC*, 750 F.2d 70, 75-76 (D.C. Cir. 1984) (holding pursuant to All Writs Act that court of appeals "may resolve claims of unreasonable delay [by agency] in order to protect its future jurisdiction" to review final agency action). The order we enter, following an opportunity for the parties to suggest changes, will be the order proposed by the Government, as modified to conform to this opinion.

1. Counsel Access to Classified Information

The Government proposes to turn over to counsel for a petitioner only information that was presented to the CSRT and that "the Government has determined petitioners' counsel has a 'need to know,'" which in practice the Government anticipates will mean turning over all the Government Information with limited exceptions for information that pertains to anyone other than the detainee, highly sensitive information, and information pertaining to a highly sensitive source. Such highly sensitive information, which the Government represents will rarely be found and redacted, would be made available to the court ex parte and in camera in the event the detainee seeks judicial review of his status determination.

Petitioners' counsel, each of whom has a security clearance, contend they have a "need to know" all information about their clients' cases and related cases in order effectively to participate in the adversarial process of review in court. Petitioners argue that ex parte and in camera review of highly sensitive classified information, as the Government proposes, is not an adequate substitute for the judgment of counsel in identifying exculpatory evidence and evidence that the Tribunal, the Recorder, or the Personal Representative failed to comply with the procedures specified for the conduct of a CSRT.

We think it clear that this court cannot discharge its responsibility under the DTA, particularly its responsibility to determine whether a preponderance of the evidence supports the Tribunal's determination, unless a petitioner's counsel has access to as much as is practical of the classified information regarding his client. Counsel simply cannot argue, nor can the court determine, whether a preponderance of the evidence supports the Tribunal's status determination without seeing all the evidence. Therefore, we presume counsel for a detainee has a "need to know" all Government Information concerning his client, not just the portions of the Government Information presented to the

Tribunal.

That presumption is overcome to the extent the Government seeks to withhold from counsel highly sensitive information, or information pertaining to a highly sensitive source or to anyone other than the detainee but presents such evidence to the court ex parte and in camera. Therefore, as required in the Status Quo Order, except for good cause shown, the Government shall provide notice to counsel for the petitioners on the same day it files such information ex parte. The court does not require the Government to disclose such information to counsel because, consistent with our rule of deference, "[i]t is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 932 (D.C. Cir. 2003); *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) ("Precisely because it is often difficult for a court to review the classification of national security information, '[w]e anticipate that in camera review of affidavits, followed if necessary by further judicial inquiry, will be the norm'").

The Government also proposes unilaterally to determine whether information is "protected," meaning that petitioners' counsel must keep it confidential and file under seal any document containing such information. For example, the Government would designate as "protected" information "reasonably expected to increase the threat of injury or harm to any person" and information already designated by the Government to be "For Official Use Only" or "Law Enforcement Sensitive."

It is the court, not the Government, that has discretion to seal a judicial record, *cf. United States v. El-Sayegh*, 131 F.3d 158,

160 (D.C. Cir. 1997) ("The decision whether to seal a judicial record is ... committed to the discretion of the district court"), which the public ordinarily has the right to inspect and copy, *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). Therefore, insofar as a party seeks to file with the court nonclassified information the Government believes should be "protected," the Government must give the court a basis for withholding it from public view.

2.  Counsel Access to Detainees

Both the Status Quo Order and the Government's Proposed Order define "legal mail" as correspondence between a detainee and his counsel with respect to subjects properly within the scope of counsel's representation.  The parties do not disagree about the rules governing mail sent by a detainee to his counsel, but they do disagree about how mail from counsel to the detainee client should be handled and about the scope of counsel's representation under the DTA.

Under both proposed Orders, a Privilege Team composed of Department of Defense personnel would open an envelope labeled as legal mail and addressed to a detainee.  Under the Status Quo Order, the Privilege Team would search legal mail only for contraband, such as staples, paper clips, or other nonpaper items; under the Government's Proposed Order, however, legal mail would be searched for prohibited content, that is, anything outside the scope of the attorney's representation (of which more below).  The Government's Proposed Order also would limit "legal mail" to:

> documents and drafts of documents that are intended
> for filing in this action and correspondence directly related
> to those documents that —

19

> i. are directly related to the litigation of this [DTA] action [and]
>
> ii. address only (a) those events leading up to this detainee's capture or (b) the conduct of the CSRT proceeding relating to this detainee[,]

thereby implicitly but effectively limiting the scope of counsel's representation to the DTA action. The Government's Proposed Order also would expressly prohibit counsel from communicating any information outside the scope of their representation.

The petitioners object to this regime, first pointing out that under the Status Quo Order, counsel have long been prohibited from telling a detainee about:

> ongoing or completed military intelligence, security, or law enforcement operations, investigations, or arrests ... or current political events in any country that are not directly related to counsel's representation of that detainee.

Because their counsel have never breached this provision, the petitioners claim the Government does not need to screen for content any legal mail their counsel might send them. The Government responds that while the Status Quo Order was in effect, some counsel — though the Government does not suggest counsel for the present petitioners — did use legal mail to inform their clients about prohibited subjects, including military operations in Iraq, terrorist attacks, Hezbollah's attack upon Israel, and the abuse at Abu Ghraib prison. The Government asserts such information can "incite detainees to violence" or cause "unrest," such as a riot, hunger strike, or suicide — as, indeed, it has done in the past.

At the least, the petitioners contend, counsel may legitimately represent the detainees in efforts to find alternate ways of ending their detention, including diplomatic means, and therefore must be able to correspond with the detainees regarding such alternatives; for example, they might want to correspond concerning which countries are suitable for seeking asylum. Using nonlegal mail is not a good alternative to using legal mail, they say, because it is very slow and heavily redacted. Moreover, the petitioners assert the attorney-client privilege, which is intended to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice," *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (internal quotation marks omitted), applies to the communications between counsel and the detainees.

Without expressing any view as to whether the attorney-client privilege applies in this context, we must agree that "full and frank communication" between a detainee and his counsel will help counsel present the detainee's case to the court, and thereby aid the process of review with which we have been charged by the Congress. Regrettably, however, we cannot disagree with the Government that past breaches of the Status Quo Order by some counsel for detainees justify the Government's proposal to narrow the topics about which all counsel may correspond with a detainee and to hold all counsel accountable by screening the legal mail they send to their detainee clients.

Relatedly, we agree with the Government that the scope of representation authorized by the DTA is limited, in the words of the Act, to the pursuit of judicial review to "determine the validity of any final decision of a [CSRT]." We read the Government's proposal, however, to limit the content of the correspondence between petitioners and their counsel to "those

events leading up to this detainee's capture" and the "conduct of the CSRT proceeding relating to this detainee," so as to include events occurring between the detainee's capture and his CSRT hearing, such as the claim of at least three of the Parhat Petitioners that they were told by military personnel as early as 2003 they would be released. This is necessary to enable counsel to follow such leads as his client can provide regarding exculpatory evidence that might be "reasonably available," but which the Recorder nonetheless failed to "obtain and examine."

In the protective order to be issued, we will include the Government's proposal to allow a Privilege Team, composed of personnel from the Department of Defense, to review legal mail in order to ensure counsel's correspondence does not include content outside the scope of the previous paragraph. The proposed procedure protects the confidentiality of communications between counsel and the detainee by providing that the Privilege Team may not disclose the content of a communication to anyone unless counsel for a detainee seeks court intervention to prevent the Privilege Team from screening or redacting information sent to the detainee, in which event the Privilege Team "may disclose the material at issue to a Special Litigation Team [in the Department of Justice and] ... to the Commander [at Guantánamo] or his representatives, including attorneys for the Government." The Special Litigation Team, none of whose members may litigate the merits of a petition brought by a detainee, represents the Privilege Team in any dispute over screened or redacted information.

3. Attorney Access to Prospective Clients

The Government refuses to give counsel access to classified information or to the legal mail system until counsel provides "written evidence" that a detainee has personally authorized counsel to represent him, even when a next friend purports to act

on behalf of a detainee.  To that end, the Government proposes to allow a lawyer one visit to Guantánamo to meet with a potential detainee client for up to a total of eight hours in which to obtain the detainee's authorization to pursue a petition for review of the detainee's status determination.  The Government asserts the eight-hour limit is needed to prevent an "unwieldy and unworkable situation," apparently referring to the burden upon the base administration of accommodating numerous visits by lawyers to meet with potential clients.

The Government believes a detainee's personal authorization is "strongly [to be] preferred" because a putative next friend probably does not satisfy the requirements for standing. *See Whitmore v. Arkansas*, 495 U.S. 149, 163, 165 (1990) (holding in habeas action "next friend" who is "truly dedicated to the best interests of the person on whose behalf he seeks to litigate" has standing to act on behalf of prisoner who is "unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability").  For one thing, each detainee has been notified of his right to seek review under the DTA.  In addition, some detainees, according to the Government, "revel in their status as enemies of the United States" and should be allowed to choose not to participate in a DTA action.

The petitioners' counsel object to the eight-hour limit upon their effort to persuade a detainee to pursue an action under the DTA because, they say, the detainees are so distrustful that it can take longer than that to persuade one to engage counsel.  They propose that a lawyer be allowed to visit a detainee as a potential client twice, for an unspecified period of time, as has been allowed until now under the Status Quo Order.

We conclude the requirement of the Status Quo Order that a lawyer "provide evidence of ... authority to represent the

detainee ... after the conclusion of a second visit with the detainee" is reasonable in that it allows the lawyer time to earn the detainee's trust and to discuss whether the detainee wants to file a petition for judicial review. The Government has not shown that two visits rather than one will harm its interests or overburden its resources. On the contrary, the Government itself has allowed that a detainee represented by counsel should not be limited to three visits with retained counsel — as the Government had first proposed in this case — because, based upon an evaluation of the "resources and needs at Guantanamo" by Rear Admiral Harry B. Harris, Commander of the Joint Task Force-Guantánamo, the Government determined such a limitation "is no longer warranted." Though the Government asserts its proposed one visit/eight-hour limitation upon meetings between a lawyer and a potential client is still "warranted and appropriate in light of the operations" at Guantánamo, it has made no showing that a lawyer's additional visit to see a potential client imposes any greater burden upon it than does a lawyer's additional visit to a client he or she already represents.

Counsel for Bismullah, who represent Bismullah's putative next friend, maintain they need present only "evidence of ... authority to represent the detainee," rather than the Government's proposed consent form bearing the detainee's signature. They argue that requiring counsel to produce evidence both that a detainee authorizes counsel to act on his behalf and that he authorizes the filing of a petition submitted by a detainee's next friend would, in effect, "eliminate next friend cases" by requiring "that each next friend action become a direct action."

In *Whitmore*, the Supreme Court concluded that the Congress, in enacting 28 U.S.C. § 2242 ("Application for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his

behalf"), had codified the historic practice of allowing a "next friend" to file a petition for habeas corpus on behalf of a prisoner. 495 U.S. at 162-63. Therefore, when the Congress later authorized this court to review the status determination of a CSRT upon the basis of a claim brought "by or on behalf of an alien [detainee]," DTA § 1005(e)(2)(B), we understand it to have permitted a next friend to petition for review of a CSRT determination when the detainee is "unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability." *Whitmore*, 495 U.S. at 165. Hence, we reject the Government's proposal to require a detainee personally to authorize a next friend to act on his behalf when a petitioner asserting next friend standing can demonstrate the detainee is under such a disability. After two visits between a lawyer and a detainee, either the lawyer should be able to obtain the detainee's express authorization to represent him in a DTA action or the would-be next friend should be able to obtain, through the lawyer, evidence of the detainee's disability and best interests sufficient to perfect the next friend's standing. *See id.* We reject the Government's proposal to require that the detainee sign a form authorizing the filing of the petition submitted by a putative next friend; the inquiry into whether a would-be next friend has standing is necessarily a matter to be determined case by case.

4. Miscellaneous

We do not believe it necessary to appoint a special master to hold hearings, order discovery, or make factual findings because we have resolved the pending procedural disputes between the parties. We therefore deny without prejudice the petitioners' motion to appoint a special master.

The Government's motion that the court consider separately the claims jointly filed by the seven detainee petitioners in *Parhat v. Gates* is granted. In order to evaluate the merits of

each Parhat Petitioner's claims, we must review a separate record of that petitioner's status determination. Accordingly, each Parhat Petitioner will be assigned a separate case number and each case will be separately briefed and assigned to a merits panel, absent further order of this court, *see Handbook of Practice and Internal Procedures, United States Court of Appeals for the District of Columbia Circuit* §§ V.A. ("[C]ases involving ... the same, similar, or related issues, may be consolidated"), III.H. (2007); Fed R. App. P. 3(b).

## III.  Conclusion

We conclude the record on review consists of the Government Information, that is, all "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant."  We grant in part and deny in part, as explained in this opinion, both the petitioners' and the Government's motions for a protective order; deny without prejudice the petitioners' motions for discovery and for the appointment of a special master; and grant the Government's motion separately to consider the claims brought by each of the petitioners in *Parhat v. Gates*, No. 06-1397.

The Clerk of the Court will enter in each of these cases a Protective Order consistent with the foregoing opinion and assign a separate docket number to each Parhat Petitioner.

*So ordered.*

ROGERS, *Circuit Judge*, concurring:  Today the court sets forth the procedures to be applied in actions under the Detainee Treatment Act of 2005, Pub. L. No. 109-148, Div. A, tit. X, 119 Stat. 2739 ("DTA") by detainees who wish to challenge the classification decision of a Combatant Status Review Tribunal ("CSRT").  I offer two observations that emphasize the unique nature of DTA actions.

First, the court sets two limitations on the attorney-client relationship.  For reasons of national security, the court authorizes the inspection of legal mail.  Op. at 3, 20-21.  That mail, in turn, is restricted in substance to matters "directly related" to this court's limited scope of review under the DTA. DTA § 1005(e)(2)(C); *see* 5 U.S.C. § 2241(e)(2); Op. at 21. Ordinarily, legal mail is not screened for content by federal prison officials, *see* 28 C.F.R. §§ 540.18, 540.19, and a prison warden "may not ask the attorney to state the subject matter of [an] . . . interview," *id.* § 543.13(d).  However, the posture of these cases and the questionable applicability of constitutional norms, *see Boumediene v. Bush*, 476 F.3d 981, 1011 (D.C. Cir.) (Rogers, J., dissenting), *cert. granted*, 75 U.S.L.W. 3707 (U.S. June 29, 2007) (No. 06-1195), add complexities.  The attorney-client privilege has a common-law basis, *see, e.g.*, *In re Lindsey*, 158 F.3d 1263, 1266 (D.C. Cir. 1998) (per curiam), but the Constitution has been used in various cases to enforce attorney access.  *See, e.g.*, *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995); *Bieregu v. Reno*, 59 F.3d 1445, 1459 (3d Cir. 1995); *Clutchette v. Rushen*, 770 F.2d 1469, 1471 (9th Cir. 1985); *United States v. Noriega*, 752 F. Supp. 1032, 1033 (S.D. Fla. 1990).  Regardless, zealous advocacy is needed in order to inform the court and to carry out Congress's grant of review in the DTA.  The court has adopted a pragmatic balance of the needs of the court and the needs of national security as determined by the Executive, to whom the court defers.  *See* Op. at 17; *see also id.* at 20-21.  However, nothing in the opinion would foreclose restoration of the full attorney-client

relationship were the Executive to determine that national security no longer requires such restrictions in DTA actions or were the detainees to be in a position to invoke the jurisdiction of this court beyond the limited scope of the DTA.

Second, the court has defined the scope of the record in terms of the plain text of the DTA and the Department of Defense's CSRT procedures. *See* Op. at 12-14. Because the court's review is for "a preponderance of the evidence," DTA § 1005(e)(2)(C)(i), the record before this court will consist of "all the information a [CSRT] is authorized to obtain and consider, pursuant to the procedures specified by the Secretary of Defense," Op. at 3. To the extent this court's DTA powers are intended to check the substance of CSRT determinations, the CSRT record for review will be only a partial record. It is incomplete for at least two reasons — and possibly a third.

1. Although a detainee has the power to request the consideration of evidence he may have on-hand and testimony of "reasonably available" witnesses, he must develop this rebuttal without knowledge of the classified information that forms the case against him. He also must do so without the benefit of counsel. Nonetheless, the detainee bears the burden of proving that he is not an "enemy combatant," a term that has proven to have an elastic nature. *See Boumediene*, 476 F.3d at 1011 n.14 (Rogers, J., dissenting); *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 468-72, 474-75 (D.D.C. 2005).

2. The "Government Information" consists only of "such reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant." Op. at 3 (quoting Memorandum from Gordon England, Secretary of the Navy, Regarding Implementation of CSRT Procedures for Enemy Combatants at Guantanamo Bay Naval Base, Cuba, encl.

1, § E(3) (hereinafter CSRT Procedures)); *cf.* Protective Order § 2.I.  Thus, the initial record is limited by unilateral decisions of the Executive.  If there are documents in the possession of the U.S. Government that were not gathered by the Recorder and considered by the CSRT, then the only recourse for a detainee is to seek the documents from the Executive as part of the DTA action and, upon obtaining them, to seek a new CSRT.  Disputes about what qualifies as "reasonably available," already a key point of contention, *see, e.g.*, Bismullah Petition for Release and Other Relief ¶¶ 165-68, 175; Pet'rs' Joint Br. in Support of Pending Motions at 23, cannot be decided today.

3.   The gap between Congress's aspirations for the DTA and the Executive's implementation of the CSRT procedures for compiling the record, which has come to light during briefing in this case, presents new questions that also cannot be resolved today.  The Executive initially asserted a curious entitlement to a "strong presumption of regularity" much as is received by an administrative agency subject to the requirements of the Administrative Procedure Act.  *See* Corrected Br. of Resp'ts Addressing Pending Preliminary Motions at 66-68; Op. at 12-14.  Then, in a post-argument submission of June 1, 2007, offering to "assist the Court in understanding the process of developing the CSRT record," the Executive acknowledged that it has not utilized the procedure for compiling the CSRT record that the Department of Defense specified in its publicly-announced procedures for conducting CSRTs.  *See* Mot. for Leave to File Decl. Describing Process of Compiling CSRT Record (June 1, 2007); Decl. of Rear Admiral (Retired) James M. McGarrah (May 31, 2007).[1]  In particular, "due to the other extensive

---

[1] *See also* Pet'rs' Joint Mot. for Leave to File Decl. of Lt. Col. Ste[ph]en Abraham (June 22, 2007); Decl. of Stephen Abraham (June 15, 2007) (attesting to command influence and departures from procedures in compiling CSRT records).

4

responsibilities of the Recorder," McGarrah Decl. ¶ 4, since September 1, 2004, the Department of Defense has construed its own requirement that "the Recorder shall obtain and examine the Government Information," CSRT Procedures encl. 2, § C(1), to permit the evidence to be sorted and assessed not by the Recorder, who must be "a commissioned officer serving in the grade of O-3 or above, preferably a judge advocate, appointed by the Director, CSRT," *id.* encl. 1, § C(2), but rather by a "Case Writer," who "received approximately two weeks of training," McGarrah Decl. ¶ 5.

Inasmuch as the DTA was designed to "legitimiz[e], through congressional action, what the Administration has done at Guantanamo Bay," 151 Cong. Rec. S11073 (Oct. 5, 2005) (statement of Sen. Graham), the Executive's belated revelation regarding the record used for CSRT proceedings is unsettling. As relevant, it leaves undetermined whether the court will be in a position to conduct the substantive evaluation, as the DTA directs, of whether a challenged CSRT determination is supported by a preponderance of the evidence, *see* DTA § 1005(e)(2)(C)(i). The Executive has previously argued to this court that the CSRT process in the DTA was designed as an adequate replacement for the writ of habeas corpus, *see* Supplemental Br. of the Federal Parties Addressing the Detainee Treatment Act of 2005, at 49-53, *Boumediene*, 476 F.3d 981 (No. 05-5062). Revelations that evidence is summarized by an anonymous "research, collection, and coordination team," McGarrah Decl. ¶ 4, whose activities have left "some of the[] electronic files . . . corrupted," *id.* ¶ 16, reinforce concerns about the adequacy of actions under the DTA as a substitute for the writ of habeas corpus. *See Boumediene*, 476 F.3d at 1004-07 (Rogers, J., dissenting).